UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

---

| | | |
|---|---|---|
| BRITTANY B. HILTON, | § | CIVIL ACTION NO.: 1:21-cv-00441 |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| SIG SAUER, INC. | § | JURY DEMANDED |
| | § | |
| | § | |
| Defendant. | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Brittany B. Hilton, files this Original Complaint against Defendant Sig Sauer, Inc., and would respectfully show the following:

## SUMMARY OF ACTION

1.      This action seeks actual, compensatory, and punitive damages, and equitable relief, relating to defendant SIG Sauer, Inc.'s negligence, defective design, and unfair and deceptive marketing practices regarding a semi-automatic firearm.   Specifically, a striker-fired, semi-automatic pistol known as the "P320" that has fired without a trigger pull on law enforcement agents and civilians across the nation over the last five years.

2.      The P320 is a striker-fired, semi-automatic pistol that was introduced to the market in 2014.   Its trigger weight ranges between 5.5 and 7.5 pounds.   It is the first striker-fired pistol SIG manufactured.

3.      A striker-fired pistol differs from the traditional "hammer-fired."   It has no external hammer to be pulled back by the thumb; rather, it has an internal "striker" that is held back under constant spring pressure like a bow and arrow.   Once the slide is moved or "racked" backward, the

weapon is fully cocked.  The only component holding the striker back is the weapon's "sear."  In this illustrative photo of a typical striker-fired pistol, the striker, in red, is held back by the sear, in blue.



4.      In January 2014, the SIG P320 was introduced in North America.  Since its inception, there have been at least fifty-four reported un-commanded discharges of the P320 involving federal agents, state and local police officers, and civilians.  Approximately ten lawsuits brought by individual plaintiffs, and three class actions, have been filed against SIG alleging that the P320 is defective, poorly made, and dangerous.

5.      Hilton, a 38-year-old Detective and 11-year veteran of the Bridge City Police Department, incurred severe and permanently disfiguring injuries when her SIG Sauer P320 X-Carry pistol discharged by itself while fully holstered in her handbag and shot her on December 1, 2020.  The bullet entered just to the left of her vagina, narrowly missed her femoral artery, traversed her pelvis front to back and exited her buttocks after leaving shrapnel near and around her sciatic nerve.

6.      As a result of the gunshot, Hilton has incurred nerve damage in the form of pain radiating down her leg and spreading to her knee.  When there is cold air, she can feel the bullet

track from the entrance wound through exit wound. She cannot put full pressure on her right leg. She has a visible entrance wound next to her vagina and a visible exit wound on her bottom. The exit wound sits on top of her coccyx and she is unable to sit for very long without shifting back and forth to attempt to relieve unremitting pain.



7.     Hilton's P320 should not have discharged without the trigger being pulled, holstered or un-holstered.  In its "Safety Without Compromise" marketing materials for the P320, SIG states:



*We've designed safety elements into every necessary feature on this pistol.  From the trigger to the striker and even the magazine, the P320 won't fire unless you want it to.*

8.      Despite this express representation, which SIG has made for the last seven years to the present day, Hilton's weapon also fired without the trigger being pulled.

9.      Hilton brings causes of action seeking actual, compensatory, and punitive damages for SIG's negligence in distributing a defective product, and breach of express and implied warranties contained in SIG's literature about the weapon, and its defective design and its manufacturing defects.

10.      Despite knowledge of safety defects with the P320's fire control unit and build quality as early as February 2016, if not long before, SIG has recklessly failed to issue a mandatory recall of the weapon.  Instead, it announced an ambiguous "voluntary upgrade" program in August 2017 that appeared to take action to address the problems, but which did not correct them.

11.      The recklessness of SIG's refusal to issue a mandatory recall is compounded by SIG's full knowledge of serious wounds inflicted upon numerous law enforcement agents and civilians across the country over the last five years to the present, whether the weapon is in its original or "upgraded" form.

## JURISDICTION AND VENUE

12.     Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. Plaintiff Hilton is a citizen of the United States and the State of Texas.  Defendant Sig Sauer, Inc. has a principal place of business in New Hampshire and, accordingly, is a citizen of New Hampshire.  The amount in controversy substantially exceeds, exclusive of interest and costs, $75,000.

13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and (c)(2). The discharge at issue occurred in Bridge City, Orange County, Texas on December 1, 2020. In particular, the discharge at issue, the injuries suffered at issued and the medical treatment for Hilton's injuries all occurred in the Eastern District of Texas.  Defendant SIG does business in and is subject to personal jurisdiction in this judicial district.

## PARTIES

14.     Hilton is a 38-year-old resident of Bridge City, Orange County, Texas who has worked as a Detective for the Bridge City, Texas police department for 11 years.  She has qualified on her city-issued firearms, including the P320 X Carry, twice a year for the last 11 years.  She has suffered severe, permanent physical injury, nerve damage, and disfigurement to intimate parts of her body, as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

15.     SIG Sauer, Inc. (hereinafter referred to as "SIG" and/or "Defendant") designs and manufactures firearms for military and commercial markets in Virginia, throughout the United States, and internationally. It markets and sells its products through dealers. SIG Sauer, Inc. was formerly known as SIGARMS, Inc. and changed its name to SIG Sauer, Inc. in October 2007. The company was founded in 1985 and has its principal place of business in Newington, New Hampshire. Defendant is a is a corporation operated for the purposes of accumulating monetary profit, that is organized under the laws of the State of Delaware and has its headquarters and

principal place of business in the State of New Hampshire, but which does business in a systematic and continuous manner throught the State of Texas and the Eastern District of Texas.  It may be served by service upon its registered again for service:  **Cogency Global, Inc., 1601 Elm St., Suite 4360, Dallas, Texas 75201.**

**ALLEGATIONS**

**I.**     **The December 1, 2020 Defective Discharge**

16.     The incident occurred on Tuesday, December 1, 2020.

17.     Hilton arrived at work around 7:50 am.  She was wearing khaki dress slacks, a pink sweater, light brown boots and a tan dress coat.

18.     She walked into her personal office and placed her gun, which was fully holstered inside her handbag, under her desk.

19.     Her city-issued duty handgun, a Sig P320 Pro X Carry 9mm was in a hip holster in her purse.

20.     She had a full magazine in the gun which holds 17 rounds. There was also round in the chamber.

21.     The rounds issued Hilton were Hornady 9mm jacketed hollow point.

22.     After placing her purse under her desk, Hilton grabbed her coffee cup. She walked to the kitchen and fixed a cup of coffee.

23.     She said hello to Dispatch and spoke with another detective, Jessica Johnnie, for a moment before returning to her office.

24.     She sat at her desk and checked her email.  She then opened up a case file and began reviewing the case.  She had an assault victim who was coming to give a statement at 10:00 am.

25.     Around 9:15 am, Bridge City Police Captain Richard Teague stated he needed Hilton to follow him to Bridge City Radiator Shop to drop off a Patrol Unit for maintenance.

26.     Hilton grabbed her keys out of her purse.  She placed it on her right forearm.

27.     She walked around her desk and remembered that her car had a funny smell that morning.  She turned around and walked back to her desk and grabbed a bottle of body mist from her desk drawer.

28.     She placed it in her purse and then walked counterclockwise around her desk.

29.     Her purse was on her right forearm and her keys were in her right hand. As she moved toward her filing cabinet at the end of my desk, she heard a shot fire.

30.     As soon as she heard the shot, she smelled gun powder. She felt searing pain as if she had been stabbed with a hot metal rod.

31.     Hilton dropped her keys and purse and took one step before falling to the floor in front of her filing cabinet and desk.

32.     Sergeant Teague was in her doorway and reacted by saying "oh, Brittany" and began to assess her injuries.

33.     Hilton felt pain in her pelvic area but did not know where she had been shot.

34.     Within a few minutes, Bridge City Chief Paul Davis arrived.  He yelled for someone to grab a towel, grabbed Hilton's hand and told her everything was going to be okay and didn't believe it hit an artery.

35.     Hilton began feeling numbness in her hips and lower back.

36.     Chief Davis placed pressure on Hilton's inner thigh, and she began shaking in overwhelming pain.

37.     EMTs transported Hilton to St. Elizabeth's Hospital where she was given pain medication immediately.  Doctors cut her pants and panties off and proceed to CT scan her.  She asked the EMT's to let her daughters know that she loved them and asked that they not find out on social media.

38.     Hilton had suffered an entrance wound near her vagina and an exit wound on her bottom.  The bullet macerated tissue, shredded muscle inside Hilton's pelvis, and left inoperable

shrapnel near her sciatic nerve.  Hilton returned home later but had to return to St. Elizabeth as her wounds opened and soaked her mattress and sheets with blood.

39.     Hilton has been through physical therapy at two different places since the P320 shot her.  The resulting physical pain became unbearable, and she was unable to take anything for it due to pre-existing sensitivities to pain killers.  The entrance wound is so close to her female reproductive organs that it has caused severe emotional, intimacy and mental distress.  She is unable to sit for very long as the exit wound sits on top of her coccyx. She is constantly in pain even lying down.

40.     Hilton is currently having to take anxiety medicine to deal with the trauma of being surrounded by the same model gun and not knowing if one will go off as hers did.  Sudden noises result in a hypervigilant response and disturb her as never before.  The burning smell of gun powder oppresses her memory and nearly makes her nauseous. Her life has changed completely since the gunshot.

II.     **The Investigation of the Incident**

41.     In a memorandum dated December 2, 2020, Captain Teague memorialized his investigation in the immediate aftermath of the incident.

42.     He stated:

> I looked at the pistol while it was inside the purse, I did not see anything on top of the pistol.  When I was looking at the purse I was still on my knees and I had turned to my left and was looking over my left shoulder.  The pistol grip to the pistol was closest to me; the bottom of the magazine was closest to me and towards the ground. I saw the rear sights.  The "paddle" portion of the holster was oriented to the window side of the officer.

> He further stated:

> I removed the pistol and holster slowly from inside the purse **and there was not anything in the trigger area of the holster that I could see.**  A blue cloth mask came out of the purse as I removed the pistol.  The mask had hole in it and as I removed it, it came from the barrel end of the pistol and holster.  I placed the pistol on Officer Hilton's desk.

(*emphasis* added)

43.     Captain Teague further noted in his memorandum that the spent casing of the round that fired on Hilton did not eject from the P320's ejection port, according to Assistant Chief Robert Bergeron.

44.     Despite numerous existing lawsuits against SIG regarding un-commanded discharges of the P320 as of the date of the Hilton incident, and the foreseeability of litigation in her particular case, SIG representative Tod Rassa sent a shipping label to the Bridge City police department later that month to ship the gun to SIG in New Hampshire for an inspection.

45.     As in every single other case involving an asserted catastrophic malfunction of the P320, SIG declared Hilton's gun to be perfectly fine.  It speculated that some unidentified "foreign object" got inside the holster - - and inside the trigger guard, wrapped itself around the trigger, and somehow overcame many pounds of trigger weight to pull it.  The one-page report noted "scuffmarks" and "gouges" that indicated a "foreign object" may have "enter[ed] the holster."

46.     During inspection of the Hilton gun, SIG took no photographs of the inside of her P320 and did not review Bridge City's investigation documents.

**III.     <u>SIG's Safety Warranties Regarding the P320</u>**

47.     Years before the incident occurred, through and including the date of the incident, SIG expressly represented that "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger to the striker and even the magazine, the P320 won't fire unless you want it to:



**SAFETY WITHOUT COMPROMISE**

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

48.     In additional marketing material, under the heading "Striker Safety," defendant SIG

SAUER further states:  The Striker Safety "[p]revents the striker from being released *unless the*

*trigger is pulled*."  (*emphasis* added).

**Striker Safety:** Prevents the striker from releasing unless the trigger is pulled.

49.     At the same time, SIG SAUER contradictorily stated in the original owner's manual

for the P320, on page 25, that the weapon may fire if dropped without the trigger being pulled if

the chamber is not empty:



⚠ **WARNING  – DROPPED PISTOL**

If dropped, the pistol may fire. Keep the chamber empty unless actually firing!

**ANY FIREARM MAY FIRE IF DROPPED**

www.sigsauer.com                                    25

50.    It is, however, standard operating procedure for all U.S. law enforcement agencies, local police departments, and the military, at a commander's discretion, to carry pistols with a chambered round.

51.    SIG was aware of the latter fact at the time it designed and manufactured all its pistols including the P320.

52.    Sometime in 2017, after a Connecticut law enforcement agent was shot by a P320 when it fell to the ground from less than three feet, it removed the warning on page 25 regarding chambered rounds, and replaced it with the following language:

 All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge**.

(*emphasis* in original).

53.    Never before had SIG, or any major gun manufacturer, represented that mere "vibration" could cause the weapon to discharge

54.    SIG also states in the manual for the P320 X series that "impact to the gun" is "abusive handling."  In the line of duty, all pistols incur impacts of differing degrees.

55.    Despite the original and new disclaimer language inserted on page 25 of the manual, SIG simultaneously warranted that the P320 was drop safe, even without a safety:



56. Yet the P320 has also fired on its own may times upon being dropped, further demonstrating the weapon's poor build quality and internal components.

57. As noted, it is standard operating procedure for all U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, including the Bridge City, Texas Police Department, to require their agents and officers to carry pistols with a chambered round.

58. SIG was aware that law enforcement officials are routinely required to carry pistols with a chambered round when it sold its P320 pistols to U.S. law enforcement agencies and departments, including the Bridge City Department.

59. It is also widespread practice among civilians who "conceal carry" their pistols to do so with a round in the chamber.  This practice is consistent with the rules of firearm safety because pistols should not be vulnerable to un-commanded discharges under any circumstances.

60.    SIG's advertisements for the P320 stress the military and law-enforcement lineage of its firearms, and highlight the modularity, safety, and functionality of the P320 for civilians and law enforcement alike.

61.    Military and law enforcement sales are a significant source of profit for SIG and are also a powerful marketing tool that it uses to spur additional sales to U.S. law enforcement and civilian markets, as demonstrated in the SIG marketing materials pictured below.





62.     As demonstrated in the above marketing materials, SIG has widely advertised that the P320 would function in a safe manner.

63.     These representations were contained within SIG advertisements, packaging, package inserts, and website, and were also delivered to retailers in the form of marketing materials and specifications which were reprinted verbatim and made available to purchasers.

## IV.    Problems with the P320 and the August 2017 "Voluntary Upgrade Program"

64.     The P320 is the first striker-fired pistol SIG Sauer ever manufactured.  SIG Sauer

assembled it using the same frame and fire control unit from an earlier hammer-fired model, the P250.

65.     In early 2016, while competing for a $580,000,000 contract to supply the U.S. Army with a new service pistol, SIG's prototype P320s exhibited 200 malfunctions or more during Army testing.  These defects included failure to eject spent casings, firing upon impact with the ground, and failing to fire.

66.     In 2016, the Department of Defense notified SIG Sauer of more than 200 malfunctions with P320 prototypes.  It demanded that SIG Sauer fix all design problems associated with the P320.

67.     In early 2016, SIG Sauer was also warned by a Florida police department that the P320 was capable of firing without a trigger pull.

68.     SIG decided not to publicly disclose the 2016 warnings it had received about the P320's defects.

69.     As early as 2016, if not years before, members of SIG Sauer's management and design teams began a concerted effort to conceal defective discharge events.

70.     This effort involved SIG Sauer employees visiting local law enforcement agencies that had reported defective discharge events and seizing the weapons for inhouse "testing" in New Hampshire.

71.     Rather than seek to learn about P320's tendency to fire without a trigger pull, SIG Sauer actively avoided learning the details of defective discharge events, and instead recharacterized and concealed them, blaming items such as keys, articles of clothing, seatbelt buckles, foreign objects, and holsters for the discharge events.

72.     In one email exchange, for example, a SIG Sauer employee claiming to investigate a February 2017 defective discharge event in Roscommon, Michigan refrained from even viewing

an incident report or a bodycam video, stating in an email that he "did not want to see anything [the police department] did not want me to see."

73.     The SIG Sauer employee sent to Roscommon, Thomas Mechling, eventually watched the bodycam video and noted that the officer in question exclaimed "tell me how a gun would fire still in the holster" after the discharge.  This discharge did not involve the weapon being dropped.

74.     SIG Sauer has since falsely claimed that the Roscommon Police Department "investigated" the incident, and "found" that the officer's seat belt buckle:  (i) plunged from its normal retracted position into the officer's holster; (ii) worked its way down to the trigger guard; (iii) wrapped itself around the trigger; and (iv) fired the gun as the officer was exiting his vehicle with no trailing seatbelt in sight.

75.     This explanation was suggested and developed by SIG Sauer employees.   The officer whose weapon discharged was never questioned about the incident.

76.     SIG Sauer has also provided items of value to officers and police departments with knowledge of P320 defective discharges, claiming internally that the endangered officers showed no distrust in the P320," and currying favor with them by leaving SIG Sauer trinkets such as hats, pins and handcuff keys.

77.     The disconnect between SIG Sauer's public representations and its private knowledge shows a conscious disregard for the lives and safety of members of law enforcement officers and the public.  At all times relevant to this Complaint, SIG Sauer employed a skillful public relations campaign, internet marketing, and in-person reassurances of the P320's alleged safety that was designed to maximize profit at the expense of safety.

78.     At the same time, SIG Sauer has privately struggled to find an engineering solution that would prevent the P320 from unintentionally firing on civilians and law enforcement officers without trigger pulls.

79.     On August 4, 2017, a Stamford, Connecticut SWAT officer sued SIG Sauer in the United States District Court for the District of Connecticut (hereinafter, "the Connecticut Suit") for damages relating to a P320 that shot him in the knee when it fell from a distance of less than three feet and hit the ground.

80.     The Stamford discharge resulted in a wave of national negative media publicity and attention regarding the safety of the P320, including on television and the internet.

81.     Four days later, SIG Sauer issued a press release stating that the P320 could fire without a trigger pull under certain conditions but "reaffirmed" the "safety" of the P320 to all users:



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

82.     SIG Sauer's claim that its new warnings regarding the capability of the P320 to fire without a trigger pull upon "shock" or "vibration" were similar to language in other manufacturers' product manuals was not true.  In fact, it is critical safety requirements that firearms only fire when the trigger is pulled.

83.     On August 14, 2017, SIG Sauer announced a Voluntary Upgrade Program (the "VU Program") for the P320.

84.     The VU Program was created for the stated purpose of "reduc[ing] the physical weight of the trigger, sear, and striker while adding a mechanical "disconnector," allegedly to make the P320 even "better" than it already was.

85.     According to the SIG Sauer website, many of these changes had "nothing to do with drop safety."

86.     The VU Program was intended to correct a defective firing assembly in several hundred thousand P320s, while denying to consumers, law enforcement, and the general public that there were any dangers inherent in the "non-upgraded" P320-platform firearms.

87.     According to SIG Sauer, these VU Program "changes" represented an "alternate design" of the P320.

88.     SIG Sauer declined to label the VU Program a "recall" and expressly stated that all P320s in circulation were safe.

89.     When the VU Program was announced in August 2017, days after the Connecticut Suit was filed, SIG knew of numerous defects with the firing control unit in the P320 for almost two years, if not longer.

90.     At the time the VU Program was announced, SIG had also just recently obtained the $580,000,000 U.S. Army contract.

91.     A mandatory recall of the P320 would have cost SIG approximately $100 million and would have been a public relations calamity for SIG in light of the Army contract.

92.     The Department of Defense submitted an urgent May 10, 2017, Engineering Change Proposal (the "DoD Engineering Change Proposal") for the prototype of the military version of the P320.   The May 10, 2017, Engineering Change Proposal provides further corroboration that SIG Sauer well knew of numerous defects with the P320 prior to the VU Program's announcement.

93.     The DOD Engineering Change Proposal demanded that its entire internal firing system for the P320 be replaced. SIG Sauer complied and made all requested engineering changes.

94.     To avoid the extraordinary costs of a mandatory recall, SIG Sauer continued to assure end users of approximately 500,000 commercial versions of the P320 that they were safe. The commercial versions of the P320 were used by law enforcement agents and civilians.

95.     SIG Sauer has never recalled the P320, despite having recalled other products known to have defects.

96.     SIG Sauer's former German sister company, SIG GMBH, sustained $35 million in financial losses after describing the VU Program it in tax filings with the German government as a "recall."

**V.      P320 Manual Amended to State that "Vibration" Can Make it Fire**

97.     As noted, sometime after January 2017, SIG Sauer removed the warning on page 25 from the user manual regarding a chambered round, and replaced it with the following dramatically different language:

 All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge**.

98.     SIG Sauer had never previously represented that mere "vibration" could cause the weapon to discharge, a statement directly at odds with its warranty that the weapon would only fire if the trigger was pulled.

99.     SIG Sauer had also expressly represented since the P320's manufacture and distribution in 2014 that the weapon possessed a "robust safety system."

100.    In fact, SIG Sauer's original design and manufacture of the P320 in 2014 (or earlier) rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, including any normal carrying, holstering, un-holstering, or rough handling in any altercation or combat.

101.    Specifically, the P320 possesses an inadequate sear-striker connection, an inadequate internal striker safety, and excessive horizontal and vertical "play" with internal parts inside the slide, and between the slide and the frame.  In addition, substantial amounts of mold injected metal "rollover" burring on the surface areas of critical internal surfaces reduce surface area contact, and render the striker-sear interface unstable and susceptible to catastrophic failure, as shown here:



**VI.** **Chronological History of Other Defective Discharges of the P320**

102.     There have been many prior incidents of defective discharges involving the P320 caused by the weapon merely being handled, accidentally dropped, or holstered or un-holstered.

103.     In February 2016, as noted, a holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, police officer's vehicle when the officer moved to exit the vehicle during a snowstorm.  The incident was captured on the officer's body cam video which shows that no object entered the officer's holster prior to or during the discharge.

104.     The officer is lucid and repeatedly states that he "has no idea" how the gun went off.  He writes nothing about the buckle in the incident report.  The seatbelt is even brought up at the scene, and both officers say it had nothing to do with it.  In the video, the seat belt buckle is visible in its normal retracted position at four different points:  15:58.24, 15:5.26, 15.59.33 and 15:59.38:



| | |
|---|---|
| OFFICER: | [gunshot] What the hell? |
| | You explain to me how a gun goes off getting out of the car. |
| 2D OFFICER: | Huh.  What? |
| OFFICER: | Yea.  Holy s***. |
| 2D OFFICER: | No s***. |
| OFFICER: | "Holy s***. |
| | |
| 2D OFFICER: | Scare the s*** out of you huh? |
| OFFICER: | Something hit my leg I don't know if I'm shot or what but.. |
| | You're my witness man    I'm glad I got a witness.  Look at that you tell me how that goes off" |
| 2D OFFICER: | I don't know man that's bizarre.  You were just standing up and it went off. |
| OFFICER: | Yea I was just getting out of the car. |
| 2D OFFICER: | Good thing it didn't get your fr*****  or hand.  I'm not a big fan of Glocks. |
| OFFICER: | It's not a Glock it's a SIG. |

| | |
|---|---|
| 2D OFFICER: | Oh it is |
| | I am going to take this out and unload the damn thing.  It even wrapped another one in.  Oh no it didn't that's a discharged round |
| OFFICER: | Can I get your name? |
| 2D OFFICER: | Yea. |
| OFFICER: | Whoo.  That could have ruined my whole goddamned day. Imagine explaining that to the sheriff. |
| 2D OFFICER: | Yea |
| OFFICER: | I'm so glad you're here man. |
| OFFICER: | Can you imagine having to explain that to the sheriff. |
| 2D OFFICER: | Did you get a concussion. |
| OFFICER: | Yeah I got a sting.  Well it blew bottom of holster out of something black went flying out |

…

| | |
|---|---|
| OFFICER: | Well at least I got my bodycam. |
| 2D OFFICER: | That surprised me. |
| OFFICER: | You thought you were surprised.  God****. |
| 2D OFFICER: | I've always worried about that |
| OFFICER: | Glad nobody got hurt |

…

| | |
|---|---|
| OFFICER: | I just for the life of me can't figure out how that went off. |
| 2D OFFICER" | Yea because there's no uh, your seatbelt wouldn't have hit that. |
| OFFICER: | No the trigger was completely covered.  I don't know I honestly don't know.  Like I said I'm glad you're my witness.  I'm going to home and have a beer. |
| 2D OFFICER: | I would too. |
| OFFICER: | Thanks man. |

105.    In 2016, the police department of Surprise, Arizona, complained to SIG of two separate incidents of P320s firing without trigger pulls.

106.    In October 2016, a P320 fired un-commanded on retired New York Police Department officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

107.    In November 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

108.    On January 5, 2017, a P320 shot un-commanded, hitting a Stamford SWAT team member in his left knee when the pistol fell to the ground, while fully holstered, from less than three feet.

109.    On February 28, 2017, a P320 discharged un-commanded while in use by the University of Cincinnati Police Department.

110.    On June 14, 2017, a P320 discharged un-commanded in Wilsonville, Oregon.

111.    On June 20, 2017, a P320 discharged un-commanded while in use by the Howell Township Police Department in New Jersey.

112.    In June 2017, SIG Sauer shipped approximately 800 P320s to the Sheriff's Department of Loudoun County, Virginia, privately assuring its leadership, Sheriff David Chapman, that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as it was.  As noted below, three P320s within this shipment, including two "upgraded" versions, later fired without trigger pulls on three Loudon County deputy sheriffs, severely injuring each of them.

113.    On July 28, 2017, a P320 discharged un-commanded in Tarrant County, Texas.

114.    On August 7, 2017, SIG's Chief Executive Officer released a statement that "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."  This

statement was false.  SIG knew, at the time of the statement, that an officer in Connecticut had been shot by a drop fire with the commercial version of the P320 some eight months earlier.

115.     On August 8, 2017, SIG Sauer announced the VU Program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."  This statement was false, or at least intentionally misleading, as there are no federal government standards for gun safety, a fact well known to SIG when it issued this press release. No federal agency oversees how firearms are designed or built. Congress exempted firearms from any federal regulation when it created the Consumer Product Safety Commission in 1972 due to Second Amendment concerns.

116.     The VU Program was presented to the public as purely optional and not urgent or mandatory.  The stated reason for the upgrade was to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnector component, and an improved sear to prevent accidental discharges.

117.     On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

118.     In October 2017, a P320 discharged un-commanded in a public place in Georgia when an officer fell to the ground in pursuit of a suspect.  The officer's weapon, which was holstered, fired without a trigger pull when the officer hit the ground.

119.     On November 12, 2017, a P320 discharged un-commanded in Tyler, Texas.

120.     In January 2018, a P320 discharged un-commanded in Dallas County, Texas.

121.     On February 7, 2018, Loudoun County Virginia Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, severing her right femur and causing catastrophic skeletal injury and deformity.  The resulting injuries necessitated four general anesthesia surgeries, caused severe emotional distress and trauma, and ended her law enforcement career.

122.    Computer tomography scanning of Sheriff Vadnais's P320 identified both a design defect and a manufacturing defect – to wit, crossed sear springs that apply upward spring pressure to the sear to keep it from falling and releasing the striker.  This defective spring installation, among other defects, resulted in unequal spring pressure and caused a precarious engagement between the striker foot and the sear, thereby rendering Sheriff Vadnais's P320 highly susceptible to un-commanded discharge.

123.    In April 2018, SIG Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320.  SIG Sauer did not recall the weapon.

124.    In May 2018, civilian Gunter Walker reported to SIG Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

125.    In June 2018, a police officer in Williams County, Ohio, reported that his P320 discharged un-commanded twice in one moment as he was attempting to move the slide backward. One round grazed the officer's arm; the other blew through his patrol car's driver side door.

126.    In May 2018, a police officer in Rancho Cucamonga, California, reported that his P320 fired un-commanded while he was walking inside his department locker room.  The casing of the round did not eject, as it should have if the firearm were operating properly.

127.    In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

128.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded, causing severe tunneling wounds to his right leg.

129.    In May 2019, Cambridge, Massachusetts Lt. Commander Thomas Ahern's P320 fired un-commanded inside a SWAT van near Harvard Square.  The spent casing did not eject.

130.    On July 23, 2019, a P320 fired un-commanded on Officer Walter Collette, Jr. of the police department of Somerville, Massachusetts, hitting him in his leg and causing substantial

injuries.

131.    On July 24, 2019, a P320 fired un-commanded on Jimmy S.C. Jinn, a United States Homeland Security Agent, at a firing range in the Bronx, New York, resulting in permanent nerve damage to his leg.

132.    In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while holstered, nearly hitting a bystander in the subway.

133.    The aftermath of the incident was captured on video, and Officer Jacklyn was returned to duty the next day with no discipline.  The Philadelphia transit authority replaced all SIG P320s, and fully exonerated Officer Jacklyn of any alleged wrongdoing.

134.    On September 3, 2019, another P320 in use by the sheriff's office in Loudoun County Virginia fired un-commanded on another deputy sheriff, Carl Costello, hitting him in his leg.

135.    On October 10, 2019, Cambridge, Massachusetts Officer Jacques Desrosiers's P320 discharged un-commanded.  The round caused life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

136.    On October 11, 2019, a P320 fired un-commanded on United States Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon.  Upon inspection, it was found that the spent casing did not eject.

137.    Major Peter Villani of the VA investigated the incident and noted that due to the design of the P320, "it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear]."

138.    On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the police department in Manteca, California, as he was preparing for work.  The P320 discharged un-commanded inside his holster as Officer Gardette attempted to fasten his duty belt

around his waist.  The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door.

139.   On December 2, 2019, a P320 fired un-commanded while in the possession of CPD Detective David Albert, as he was in the process of putting on his duty belt.

140.   In January 2020, a fully holstered P320 fired un-commanded on an Army veteran, Tanner Larson, in Utah, penetrating his leg and impacting his femur bone.

141.   On February 27, 2020, a fully holstered P320 fired un-commanded on a retired Tampa police officer, Robert Northrop, causing catastrophic bone damage to his lower left leg.

142.   In June 2020, a P320 fired un-commanded on an officer in Pasco County, Florida, severely wounding him in his right leg.  This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

143.   In June 2020, a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster, and resulting in a broken bone in the civilian's foot.

144.   On July 14, 2020, a P320 fired un-commanded on the partner of an officer who was attempting to subdue a suspect in Milwaukee, Wisconsin, causing him serious injury.

145.   On September 21, 2020, a P320 fired un-commanded on a United States Immigration and Customs Enforcement agent at a firing range in Maryland, striking him in the leg and causing serious injury.  The weapon discharged when the ICE agent placed his hand on the grip to the draw gun.

146.   On November 5, 2020, a P320 fired un-commanded on a member of Canada's elite Joint Task Force 2, causing him bodily harm.  In a press release, SIG Sauer blamed the discharge on the weapon's holster.

147.   On November 9, 2020, a P320 fired un-commanded on Officer Jerry Wyche of the Tampa Police Department while he was sitting in his patrol car.  His partner in the passenger seat

witnessed the weapon fire without Wyche doing anything to make it fire.  The explosive force of the discharge sent shards of the holster to impact and burn his leg.

148.    In December 2020, a P320 fired un-commanded on a second ICE agent at a firing range in Tennessee.  The bullet resulted in a tunnel wound to her right thigh.

149.    On December 1, 2020, a fully holstered P320 discharged un-commanded while inside a sex crimes detective's handbag in Bridge City, Texas.  The bullet entered millimeters away from her vagina and exited her rear end, leaving inoperable shrapnel near and around her sciatic nerve.

150.    In January 2021, a P320 fired un-commanded on a gun shop manager in Three Rivers, Texas as he began to clear the weapon.  The round caused injuries to his hand that ultimately resulted in amputation of one of his fingers.  The weapon was out of battery when it fired.

151.    In January 2021, a P320 again fired un-commanded on an undercover officer in Milwaukee, Wisconsin as he stood to get out of the car.  The discharge is captured on parking lot surveillance video.  Both the officer's hands were full.  The P320 can be seen to rocket out of the holster, hit the side of the car, and ricochet in the air before hitting the ground.

152.    On May 12, 2021, a P320 fired un-commanded on a second HSI agent conducting firearms training at a range in Cottage Grove, Minnesota without the trigger being pulled.  The bullet left two entry and exit wounds in her right thigh and calf and shattered her fibula.

153.    On May 15, 2021, a fully holstered P320 fired un-commanded on a DC Metro Transit police department officer inflicting thermal burns along her right thigh.

154.    In June 2021, the Pasco County, Florida, Sherriff's Office replaced its entire arsenal of P320s with Glock 19s after four separate incidents of its P320s discharging un-commanded, striking two officers in their respective legs causing significant injuries.

155.    In June 2021, a P320 fired un-commanded on a police officer at a firing range in

Troy, New York, severely injuring his right leg.

156.    On June 22, 2001, a P320 fired un-commanded on an HSI agent in Tameling, Guam.

157.    On or about August 4, 2021, a P320 fired un-commanded on an ICE agent transporting a prisoner to Saint Clare County Jail in Detroit, Michigan.  This incident was also captured on video.

158.    On August 12, 2021, a P320 fired un-commanded on an Army veteran in Texas when it fell from approximately 18 inches from a nightstand.

159.    Upon information and belief, employees at SIG Sauer's training academy in New Hampshire have admitted to defective discharges causing injury in both 2016 and 2017.

## COUNT I

## STRICT PRODUCT LIABILITY

160.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 159 of the Complaint, as though fully set forth herein.

161.    SIG Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable because:

a. SIG Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

b. The product involved in the subject incident was marketed and/or placed in the general stream of commerce by SIG Sauer;

c. The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

d. The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

162.    The P320 was in a defective condition as: (1) the danger contained therein was

unknowable and unacceptable to the average or ordinary consumer; and/or (2) a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

163.    SIG Sauer breached its duties, by and through its agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

164.    The defective condition of the P320 caused Plaintiff's injuries.

165.    SIG Sauer is therefore strictly liable to Plaintiff.

<u>**COUNT II**</u>

**NEGLIGENCE**

166.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 165 of the Complaint, as though fully set forth herein.

167.    At all relevant times, SIG Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon him merely placing his hand on the weapon's grip before selling the gun and placing it into the stream of commerce.

168.    At all relevant times, SIG Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing upon gripping the weapon before selling the gun and placing it into the stream of commerce.

169.    At all relevant times, SIG Sauer owed a duty to unambiguously warn consumers and/or intended users of the P320, including Plaintiff, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.  Upon information and belief, SIG Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, industry

publications and research, and other sources of information to be developed in discovery.

170.    SIG Sauer breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;

ii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

iii.    By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iv.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

v.      By negligently failing to unambiguously warn purchasers and end users of the gun, including Ahern, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

vi.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vii.    By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

viii.   Other negligent acts and omissions to be developed in the course of discovery.

171.    SIG Sauer knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including death.

172.    The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even

upon performing a reasonable inspection of the same.

173.    SIG Sauer's negligence as alleged in this Count directly and proximately caused the May 19, 2019, un-commanded discharge and Plaintiff's injuries resulting from the accident.

174.    As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

## COUNT III

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

175.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 174 of the Complaint, as though fully set forth herein.

176.    At all relevant times, SIG Sauer was in the business of marketing, selling, and distributing weapons, including the gun causing Plaintiff's injuries.

177.    SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

178.    At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of SIG.

179.    SIG breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

> i.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

    ii.     Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

    iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

    iv.    Negligently failing to unambiguously warn purchasers and end users of the gun, including Ahern, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    v.     Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

    vi.    Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

180.   Plaintiff, as the end user of the gun, was a person who would foreseeably be injured by breaching the implied warranty referenced in this Count and SIG's breach of the warranty of merchantability as alleged herein directly and proximately cause the accident and Plaintiff's injuries.

181.   As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

## COUNT IV

## BREACH OF EXPRESS WARRANTY

182.   Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 181 of the Complaint, as though fully set forth herein.

183.   At all times material hereto, SIG Sauer was in the business of marketing, selling,

and distributing weapons, including the gun causing Plaintiff's injuries. Upon information and belief, SIG knew or had reason to know the gun would be situated in holsters that would need to be removed from a law enforcement end user's service belt at the time they sold the gun, and that the purchaser was in fact relying on SIG Sauer's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without firing.

184.   Accordingly, SIG Sauer impliedly warranted that the gun was suitable for the particular purpose of being situated within a holster that would need to be removed from service belts from time to time.

185.   At all relevant times, Plaintiff used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of SIG Sauer in using and handling the gun and its SIG Sauer-issued holster.

186.   SIG Sauer breached the above-referenced implied warranty as to the gun in that it was unreasonably dangerous and unfit to be removed while in its holster at the time it left SIG Sauer's possession by virtue of:

    i.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

    ii.    Failing to issue a mandatory recall of the P320 as SIG Sauer had done in the past with other defective products;

    iii.    Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

    iv.    Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Plaintiff, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    v.    Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG Sauer , and during which times employees, servants

       or agents of SIG Sauer had an opportunity to inspect, service and work on the gun;

vi.     Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges;

vii.    Expressly warranting that the gun would not fire unless the trigger was pulled.

187.    As a direct and proximate result of the breaches set forth in this Count, Plaintiff suffered emotional distress, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, and loss of earnings and earning capacity.  These injuries are either permanent or continuing in their nature and Plaintiff will suffer such losses and impairments in the future.

## COUNT V

### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a)

188.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 187 of the Complaint, as though fully set forth herein.

189.    The SIG P320 is a consumer product as defined in 15 U.S.C. § 2301(1).

190.    Plaintiff is a consumer as defined in 15 U.S.C. § 2301(3).

191.    At all relevant times, SIG Sauer was a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

192.    In connection with the sale of the P320 issued to Plaintiff in 2018, SIG Sauer made implied and express warranties, as defined in 15 U.S.C. § 2301(6), that the P320 was safe for its intended purposes and would not fire un-commanded -- i.e., without a trigger pull.  In fact, Plaintiff's P320 was capable of firing, and did fire, without a trigger pull, contrary to SIG Sauer's warranties.

193.    SIG Sauer breached the warranties it made stating that the P320 was safe for its intended and foreseeable uses and particular purposes.

194.    Starting in 2017, SIG has attempted to modify and/or disclaim the implied and express warranties it made regarding the safety of the P320 by stating that "vibration," "shock," and dropping on the ground, among other factors, could make the P320 fire without a trigger pull.

195.    SIG Sauer's attempt to modify and/or disclaim its prior warranties regarding the safety of the P320 violate section 2308(a) of the Magnuson-Moss Warranty Act (the "Act").

196.    SIG Sauer's violation of the Act has been the direct and proximate cause of substantial economic and non-economic damages incurred by Plaintiff.

## COUNT VI

### Gross Negligence

197.    Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 196 of the Complaint, as though fully set forth herein.

198.    SIG Sauer's acts and omissions constitute gross neglect.  Viewed objectively from the standpoint of SIG Sauer at the time of the occurrence, SIG Sauer's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff and SIG Sauer had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of Plaintiff.  As a result of the gross neglect of SIG Sauer, Plaintiff was exposed to and did sustain serious and grievous personal injury.

199.    SIG Sauer's gross negligence directly and proximately caused Plaintiff's injuries.

200.    Exemplary damages are therefore mandated for SIG Sauer's misconduct and violations of law.

## COUNT VII

### Resulting Legal Damages

201.    SIG Sauer's acts and omissions caused Plaintiff to sustain legal damages.

Case 1:21-cv-00441   Document 1   Filed 08/16/21   Page 38 of 39 PageID #:  38

202.    Plaintiff is entitled to be compensated for the personal injuries and damages that she has sustained and will sustain, including:

      i.    The amount of medical expenses necessarily incurred in the treatment of Plaintiff's injuries from the date of the incident in question up to the time of trial;

      ii.    The amount of medical expenses in the treatment of Plaintiff's injuries that, in reasonable medical probability, will be incurred in the future;

      iii.    The physical pain and suffering in the past that Plaintiff has suffered from the date of the incident in question up to the time of trial;

      iv.    The physical pain and suffering that, in reasonable probability, Plaintiff will suffer from in the future;

      v.    The mental anguish that Plaintiff has suffered from the date of the incident in question up to the time of trial;

      vi.    The mental anguish that Plaintiff, in reasonable probability, will suffer in the future;

      vii.    The damages resulting from the physical impairment suffered by and the resulting inability to do those tasks and services that Plaintiff ordinarily would have been able to perform;

      viii.    The damages that, in reasonable probability, will result in the future from the physical impairment suffered by and the resulting inability to do those tasks and services that Plaintiff ordinarily would have been able to perform;

      ix.    The disfigurement which Plaintiff has suffered from the date of the incident in question up to the time of trial;

      x.    The disfigurement which Plaintiff will, in reasonable probability, suffer from in the future;

      xi.    The loss of any earnings sustained by Plaintiff from the date of the incident in question up to the time of trial; and

      xii.    The loss or reduction in Plaintiff's earnings or earnings capacity in the future beyond the time of trial.

203.    Plaintiff is entitled to pre- and post-judgment interest at the maximum legal rates.

204.    Further, Plaintiff is entitled to exemplary damages due to Defendant's negligence and gross negligence in the amount of $15 million.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that she have judgment against Defendant for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, and all other relief, at law or in equity, to which Plaintiff may be justly entitled.

Dated:  August 16, 2021

Respectfully submitted,

Jeffrey S. Bagnell
Federal Bar No. CT18983
Pro Hac Vice application to be filed
Jeffrey S. Bagnell, Esq., LLC
55 Post Road West
Westport, CT  06880
(203) 984-8820
jeff@bagnell-law.com

SICO HOELSCHER HARRIS LLP
*/s/ James H. Hada*
James H. Hada
Federal Bar No. 11527
3 Riverway, Suite 1910
Houston, Texas 77056
Office:        713.465.9944
Facsimile:    877.521.5576
E-Mail:        jhada@shhlaw.com

ATTORNEYS FOR PLAINTIFF