**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS, BEAUMONT DIVISION**

| | | |
|---|---|---|
| BRITTANY I. HILTON, | § | CIVIL ACTION NO.: 1:21-cv-00441 |
| | § | MJT |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| SIG SAUER, INC., | § | |
| | § | |
| | § | |
| Defendant. | § | |
| | § | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

I.    **Summary**

Sig's Motion should be denied.

As the honorable Court is aware, this case is part of ongoing national litigation regarding the Sig Sauer P320 semi-automatic pistol. Despite the volume of cases and evidence showing that the P320 can fire without a trigger pull, Sig has refrained from issuing a recall or safety warning for many years. Apparently believing bad news gets better with age, it has instead decided to litigate the problem around the country.

In this case, Sig's motion is based solely on its challenge to two of Hilton's three firearms experts, Timothy Hicks and Peter Villani. It makes no challenge to her expert Jonathyn Priest, whose report also concluded that her P320 discharged in its holster. (Ex. 1).[1]

---

[1]    Contrary to what Sig claims (Docket No. 8, fn. 2), Priest opined that Hilton's P320 fired without a trigger pull: "39. The evidence and provided materials support, to a reasonable degree of technical certainty, that the holstered Sig Sauer P320 carried by Detective Hilton discharged without manipulation of the triggering mechanism. 40. The evidence further supports, to a reasonable degree of technical certainty, that the holstered firearm was in a position comparable to that expected with a holstered firearm at the moment of an unintentional discharge."

Her experts' opinions are based on reliable methodology, sufficient data and are supported by eyewitness statements, affidavits and videotapes of the P320 discharging without a trigger pull around the country. The opinions are relevant to the issues in the case under Fed. R. Evid. 702. Sig relies on one opinion from a South Carolina district court in a case involving a P320 out of a holster. That court conducted no evidentiary hearing and the unholstered gun in that case was being carried inside the rear waistband of pants. Factually, therefore, it bears no similarity to the case at hand.

In a recent decision involving a holstered P320 in New Hampshire, Sig's identical motions to exclude Hicks and Villani were denied in full and part, respectively. Both testified at trial in July 2022. An obviously divided jury returned hung after a weekend and full day of deliberations.[2] Sig's motion for summary judgement based, as here, on its *Daubert* arguments, was denied in a 20-page opinion by Chief Judge Landya M. McCafferty:

> Specifically, Villani observed and measured the contact area between certain parts of the P320 that, given his knowledge and experience about how pistols operate, he knows are meant to stay in contact or engaged with each other until the gun's trigger is pulled. Villani observed that the edges of these parts he analyzed are rounded. Based on his measurements and observations, and his knowledge of firearms components and their mechanics, Villani concluded the parts could slip over each other and allow the gun to be

---

[2]     The *Guay* jury submitted no less than five successive questions after evidence and demanded an in-court demonstration of the gun being removed from the exploded Sig holster. Despite the questions and demonstration, it returned hung after a full day of deliberations as the foreman's emphatic handwriting showed. (Ex. 2). It was only after the Court read an *Allen* dynamite charge that it finally came back in favor of Sig. *Guay v. Sig Sauer, Inc.,* No. 1:2020cv00736 (Docket entries July 25, 2022 *et seq*.). Contrary to what Sig claims, it made no "findings" that the gun had no defects; no special interrogatories were ever submitted.

Highlighting the jury's conflict, the Judge disagreed with the post-Allen verdict, stating that Guay's holstered P320 discharged while fully seated in its destroyed holster. (Docket No. 108, p. 5; "[t]he court found Guay credible in every respect. Specifically, the court credits Guay's testimony that the gun was still fully inside the holster when it discharged. With the gun fully in the holster, Guay could not have accessed the trigger; it would have been impossible for him to have accidentally pulled it. Moreover, as expert testimony revealed, the P320 had a 6.7 pound trigger, meaning that to fire, the user had to exert 6.7 pounds of pressure. The court does not believe that Guay could have applied that amount of force to the trigger inadvertently while the gun was in the holster").

fired without someone pulling the trigger. Because the opinion is supported by reliable foundations - - Villani's measurements, observations, and his experience about how firearms work - - it is sufficiently reliable to be admissible.

. . .

Hicks is qualified to opine about all aspects of his opinion. Hicks is a mechanical engineer with substantial experience, and he specializes in the technicalities of product performance and failure. Accordingly, his training and experience provide a basis for expertise in the mechanical workings of a product, including a gun.

*Guay v. Sig Sauer, Inc*., 1:20cv00736 (LM) Docket No. 72, (July 11, 2022) (D. NH.) (Ex. 3, pp. 12, 16).

Sig's briefs mention Judge McCafferty's opinion in a footnote only. (Docket No. 27, p. 1, fn. 2). This is no surprise for she expressly found Sig's own experts "unpersuasive" and not credible for failing to investigate numerous incidents of P320s defectively discharging across the country:

To the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive. As discussed, the court found credible Guay's testimony that he did not pull the trigger, and the video of the Roscommon incident was persuasive in showing that a P320 can fire without a trigger pull. Furthermore, Watkins admitted that – despite having read the numerous allegations of misfires (without a trigger pull in the complaint – he did not deem them worthy of mention in his expert report. And Toner testified that he found such misfire allegations unworthy of investigation. Had Watkins and Toner been less dismissive of these allegations, the court may have found their testimony more credible.

Ex. 4, p. 13, fn. 2.

Hicks, a mechanical engineer with substantial firearms experience and a certified armorer on the P320, has with sufficient basis opined that Hilton's gun fired while fully seated in her holster after reviewing CT scan images of the gun, up-close images of the surfaces of the striker foot and sear face inside its fire control unit, several other P320s that contained the same manufacturing defects,[3] a missing safety lever return spring, videotapes of similar incidents and

---

[3] "Examination and/or testing of an exemplar of the same product, in combination with a review of photographs of the allegedly defective product and/or testimony regarding the circumstances and nature of the

the facts of the incident itself.

Villani, also an armorer on the P320, has opined based on vast experience with firearms that Hilton's P320, and numerous others he personally inspected, all possessed substantial manufacturing defects that would allow the gun to discharge without a trigger pull. This is not a novel or unreliable opinion given that Sig Sauer's own August 4, 2017 press release on the P320 stated that vibration could make the original gun's safety mechanism fail. (Ex. 5).

Contrary to what Sig suggests in its briefs, it is settled that:

An expert witness can testify on the basis of his own experience alone. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

So long as an expert's scientific testimony rests upon "'good grounds,' based on what is known," *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590 (1993) it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities*." Id.* at 596.

Villani need not possess a degree in mechanical engineering, as Hicks does, to have extensive "specialized expertise" and knowledge in firearms and specifically the Sig P320, which the jury should be allowed to weigh. He was, as noted, just allowed to testify in July 2022 as an expert before a jury in the District of New Hampshire in the *Guay* matter.

## II.    <u>Factual Background</u>

In January 2014, the Sig P320 was introduced in North America. It was the first striker-

---

allegedly defective product's failure, may, in some cases, constitute an entirely adequate and reliable methodology for an expert to employ, especially where examination or testing of the allegedly defective product itself is impossible, impracticable, or would implicate issues of spoliation". *Peters-Martin v. Navistar Int'l Transp. Corp.,* 410 F. App'x 612, 620 (4th Cir. 2011).

fired weapon it produced, an advanced, single-action design in which the gun is under constant internal spring pressure to fire like a sling shot or bow and arrow.  It has no external hammer but an internal "striker" that is under spring pressure to fly forward and hit the rear of a round once the slide is racked.[4]  Since its inception, there have been at least, according to Sig's accounting,[5] 55 reported un-commanded discharges of the P320 involving federal agents, state and local police officers, and civilians, the latest in Milwaukee, Wisconsin.  Approximately 19 lawsuits brought by individual plaintiffs, and three class actions, have been filed against SIG alleging that the P320 is defective, poorly made, and dangerous.

https://www.fox6now.com/news/why-milwaukee-police-sig-sauer-guns-accidentally-going-off

In recent deposition testimony, Sig corporate representatives have admitted that the company had knowledge of asserted involuntary discharges of the P320 as early as February 2016, more than five years ago.  Yet it has never issued a recall or safety warning since that time, despite doing so for other Sig products the company deemed susceptible to un-commanded

---

[4]     A basic animation of how a striker fired design works can be seen here.  A key difference with the P320, however, is that it is fully cocked after the slide is racked, not partially cocked as shown in the animation.  https://www.youtube.com/watch?v=9iNjtnSARZ4

[5]     The number is likely conservative given that Sig this month twice stated in a 30(b)(6) deposition that it "did not know" how many un-commanded discharges of the P320 have occurred since it was introduced in 2014.

Q.     On the first page, number one. I want to read this into the record.  "The number, type, date, and location of all reported accidental discharges involving the Sig Sauer P320 pistol and any of its variants from January 1st, 2014, to the present."

Do you see that?

A.     Mm-hm.
…
Q.     Can you answer that question on behalf of Sig Sauer?

A.     That is not a question I can answer, no.

(Ex. 7, Sig dep, pp. 15-16).  It was only upon additional questioning by counsel that the number "55" was eventually stated.  (Id., p. 84).  The true number of incidents, based on reports, deposition testimony, and court filings, is believed to exceed 100 if not far more.

firings.  (Ex. 6, Safety Warning and Mandatory Recall notice for Sig "predator" rifle").

Hilton, a 39-year-old detective, 11-year veteran of the Bridge City Police Department, and mother of four, incurred severe and permanently disfiguring injuries when her SIG Sauer P320 X-Carry pistol discharged by itself while fully holstered in her handbag and shot her December 1, 2020.  The bullet entered just to the left of her vagina, narrowly missed her femoral artery, traversed her pelvis front to back and exited her bottom after leaving shrapnel near and around her sciatic nerve.  Due to the gunshot, Hilton has incurred nerve damage in the form of pain radiating down her leg and spreading to her knee, and severe emotional trauma.  She has a visible entrance wound next to her vagina and a visible exit wound on her bottom. The exit wound sits on top of her coccyx and she is unable to sit for very long without shifting back and forth to attempt to relieve unremitting pain.  She will probably need additional future surgery because the injury forces her to favor her left leg over her right.  (Ex. 8, Hilton dep., pp. 57-59; 76-77, 80-82, 88).

Hilton testified that on the morning of December 1, 2020, she was preparing for an inteview with a sexual assault victim:

A.    December 1st I went into work normal time.  I walked - - I opened my office and go put my purse down, set it underneath my desk.  I was getting ready to prepare for an interview.  It was a sexual assault interview.

And I went to the front, and we have a little kitchen area.  I was getting coffee, said 'hello' to another one of our investigators or dispatch, you know, make the morning rounds.  Got some coffee went back to my office. As I'm walking by, my captain asked me to bring him to the radiator shop to pick up a vehicle.  I don't remember if it was follow him or pick him up.  I do remember.  He wanted me to pick him up.  And I was like oh, man, my car had this funny smell because we have a bunch of cats by the PD.  And I was - - I went back and wanted to get some body spray.

So I went and got body spray out of my - - out from underneath my desk.  I put that in my purse and I grabbed - - I grabbed my keys.  My keys have a big loop.  And then I looped my arm through my purse, both straps, on my forearm, my keys in my hand.  And as I'm

6

walking where my filing cabinet and my desk end, I'm walking around, and the gun goes off.  I drop my keys, dropped my purse.

I felt like this hot feeling like - - like a stabbing pain.  I mean, I felt like - - I honestly thought that I had been shot in my vagina.  Sorry.

Q.      Take your time.  Take as much time as you need.

. . .

A.      They did the CAT scan and, you know, the - - one of the nurses said that I was very lucky because it almost hit my femoral artery.  He said, "you wouldn't be here."  He said, "it was about a millimeter from hitting your femoral artery, and it shredded the muscle."

(Ex. 8, Hilton dep., p. 56, 59) [next page].



(Ex. 9).

It is not credibly disputed that Hilton's P320 was fully inside its holster at the time her gun fired. The contemporaneous incident reports all place the P320 inside Hilton's handbag and holster. Sean Toner, the P320's designer and one of Sig's experts, testified this month that he "did not know" what made Hilton's gun fire. (Exhibit 10, Toner dep., p. 50 "I don't have a knowledge of what pulled the trigger").

Derek Watkins, another Sig expert, also recently testified that because in his estimation it is impossible for the P320 to fire without a trigger pull, "something" or someone must have pulled the trigger in every instance. (Ex. 11, Watkins dep., p. 25 "the gun will not discharge absent a trigger pull").[6] His is a true *ipse dixit* argument, i.e., because he says the Sig P320 can never malfunction - - despite substantial video and eyewitness evidence to the contrary, it necessarily follows that "something" must have pulled the trigger. He admitted that he did not test or replicate the circumstances of the discharge in a closed handbag such as Detective Hilton was carrying that morning:

> Q.     Was there any attempt to recreate the actual incident, in terms of putting a holstered P320 in a purse with other objects in it at any time?
>
> A.     No. I wasn't part of any if there were.

(Ex. 11, p. 22);

and that he, like Toner, does not know what made Hilton's P320 fire:

> Q.     Well, what do you think pulled Ms. Hilton's trigger?
>
> A.     We don't have enough information to lock it down to any one thing because there were no witnesses other than Ms. Hilton, who didn't see the gun actually

---

[6]     The New Hampshire court, as noted, found this testimony during the Guay trial "unpersuasive." *See supra*, p. 3 ("[t]o the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive").

discharge, according to her testimony.  So the thing is we don't have enough
information.

(Ex. 11, pp. 24-25).

The Bridge City police department's incident report a day later, which states that no

foreign object was found in Hilton's holster or in her trigger guard, is not listed on the items

Watkins or Toner reviewed before their reports were disclosed.  The incident report, authored by

Bridge City Captain Richard Teague the following day, expressly states that he removed Hilton's

holstered P320 as it was resting in the handbag.  He noted that there was nothing on top of

the pistol nor anything in the holster area of the gun that he could see after he removed it from

the purse:

> I looked at the pistol while it was inside the purse, *I did not see anything on top of the
> pistol.*  When I was looking at the purse I was still on my knees and I had turned to my
> left and was looking over my left shoulder.  The pistol grip to the pistol was closest to
> me; the bottom of the magazine was closest to me and towards the ground.  I saw the rear
> sights.  The "paddle" portion of the holster was oriented to the window side of the
> office[r].  I removed the pistol and holster slowly from inside the purse and ***there was not
> anything in the trigger area of the holster that I could see.***  A blue cloth mask came out
> of the purse as I removed the pistol.  The mask had a hole in it and as I removed it, it
> came from the barrel end of the pistol and holster.

(Ex. 12) (emphasis added).

Teague affirmed these facts in his later deposition testimony:

A.    And so her purse was over on to my left side. I did remove the pistol from her purse.  I
notice when I pulled it out, it was in the holster.  There was nothing that was in the
trigger guard at that time. There was a - - with the COVID, there was a blue mask, and I
could tell that it had been towards the end of the holster, not where the - - the grip of the
pistol was, but the barrel end of where the holster was because of the bullet hole in it and
how it was kind of wrapped kind of around the end of the barrel, like where it just laid on
top of it and the mask was on the barrel end of it.

…
Most of the mask, and as far - - the best I can recall, even where the loops were, it was all
towards the barrel end.  It wasn't - - if you on the - - in the picture of where the release is,
on the side of the - -

10

Q.      The magazine release?

A.      No, ma'am.

Q.      Oh.  I'm sorry.  Oh.

A.      On the actual holster to release it.  I remember most of the mask being on that end – not near the trigger, not near the grip of the pistol, and not near the magazine, but more towards the end of the actual - - the barrel end of the holster and the pistol.
        …

Q.      Do you have any issues or concerns with your personally owned P320?

A.      I don't carry it anymore; no, ma'am.

Q.      Why don't you carry it anymore?

A.      As long as I've been around firearms, I need to make sure it's going to do the job that it's supposed to do.  And after this incident, I have heard of several other incidents, so I'm just not quite sure.

(Ex. 22, Teague dep., pp. 10, 17-18, 46).

Hilton, as a detective charged with interviewing sex assault victims, testified that she kept her holstered gun in her purse frequently to make victims feel more comfortable.  No Bridge City Police Department policy or Sig P320 manual provision prohibited transporting a holstered P320 in a handbag or other container:

Q.      Did you often carry your gun in your purse in that timeframe?

A.      Yes.

Q.      Okay.  And for how long had you carried your gun in your purse?

A.      Well, it was dependent on the - - if I was doing an interview or what  - - what my day entailed.  I would either carry - - so I mean one or two times a week, it was in my purse … mostly if I was going to interview someone, like if I was going to have someone come in my office and needed a comfortable environment or I felt more that they would relate to me more so if I didn't have my gun on my hip, you know.

(Ex. 8, Hilton dep., pp. 27-28).

**III.    Response to Statement of Undisputed Facts**

Preliminarily, Hilton objects to Sig's Statement of Material Facts on the grounds that it appears to be in small 10-point font contrary to the Local Rules. Having stated the objection, Hilton responds as follows:

## A. <u>Underlying Incident</u>

1.      Sig allegation: "Plaintiff, Bridge City police officer Brittany Hilton, claims she was injured when her department-issued Sig Sauer P320 pistol discharged a round without the trigger being pulled. *See* Pl's Compl. (Ex. B)."

**Response:**

**Admitted.**

2.      Sig allegation:  "The loaded pistol was being carried in Plaintiff's purse—along with many other loose items—when it discharged. *See* Hilton Dep. 61:3-14 (Ex. C)."

**Response:**

**Denied.  Hilton's loaed pistol was being carried *in a holster* inside her purse with other items when it discharged.  (Ex. 8, Hilton dep., p. 54; Ex. 12, Bridge City December 2, 2020 interoffice memorandum).  Denied that the other items were "loose"; they were simply other items in her handbag with no means to lock them in place.  Sig appears to be suggesting that mere *contact* with items in Hilton's purse such as body spray, a small bottle of vitamins, a cloth mask, a small stuffed animal, and a phone charging box and contained cord may have been enough to make a holstered P320 fire.  This is contrary to its warranty that the P320 "won't fire unless you want it to."  If mere contact with such items is sufficient to make a holstered P320 fire, Sig should state this fact in a safety warning in the P320 manual.  The manual shows an unholstered P320.**



All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge**.

**(Ex. 13, Sig P320 manual).**

3.      Sig allegation.  "Plaintiff picked up her purse from beneath her desk, dropped a bottle of body spray into it, and looped the straps of the purse over her forearm. *See* Hilton Dep. 56:12- 22 (Ex. C).

        **Response**:

        **Denied.  Hilton's testimony was that she placed the body spray in her handbag, not that she "dropped" it in it.  (Ex. 8, Hilton dep., pp. 56, 59).   The remainder of the allegation is admitted.**

4.      Sig allegation:  "As she started to walk out from behind her desk, the pistol discharged a round into her upper thigh. *See* Hilton Dep. 27:16-19 (Ex. C).

        **Response:**

        **Admitted.**

**B.      Plaintiff's Experts Peter Villani and Timothy Hicks**

5.      Sig allegation: "In support of her claim, Plaintiff disclosed expert liability reports from Peter Villani and Timothy Hicks."

        **Response:**

        **Admitted in part.  Hilton also disclosed an expert liability report from Jonathyn Priest.  (Ex. 1).**

 6.      Sig allegation:  "As discussed in Sig Sauer's *Daubert* motions, neither Villani nor Hicks have any experience in firearm design or manufacture and, therefore, neither is qualified to render the design and manufacturing defect opinions they provide in this case. *See* Villani Dep. in Hilton at 23:22-25:7 (Ex. D); Hicks Dep. in Hilton at 21:17-22:8; 141:2-4 (Ex. E). "

        **Response:**

        **Denied.  Hilton incorporates by reference her response to Sig's Motions to Exclude Hicks and Villani.**

7.      Sig allegation: "Moreover, both Villani and Hicks confirm they have not conducted ***any testing*** to confirm that any of their purported design and manufacturing defects could actually cause a P320 pistol to fire without a trigger pull. *See* Villani Dep. in Hilton at 27:3-17; 22:22- 23:2; 52:21-24; 55:2-2."

        **Response:**

Denied.  The allegation is argumentative in that Hicks and Villani both state that Hilton's P320 discharged without a trigger pull to a reasonable degree of certainty.  Toner himself admitted under oath that he was not even sure how such testing could be done and that it had never been done on holstered P320s.[7]  Both Hicks and Villani that they engaged in substantial examination and imaging of the Hilton and other P320s claimed to have discharged without trigger pulls and viewed real world replication of P320s discharging without trigger pulls.  Both opine that Sig is not machining the surface faces of raw components in the fire control unit smooth.  This omission results in a dangerous reduction of surface contact between the spring-charged striker foot/sear face connection.  Admitted that neither expert, nor Sig's experts, attempted to recreate the precise circumstance of Hilton's P320's discharging, i.e., no robot was placed on a treadmill to walk with a holstered P320 in a handbag for months or years to impart the inertial force required to make the striker foot and sear face connection to eventually fail:

A.    The vibration testing that was done in 2021, well after this incident. It does not comprehend the firearm being in the holster and the loads and motions involved. Sig has even testified that they don't know how to even do that kind of test.  So, I'm just saying that that would be a more realistic functionality test.· To say that the six things that the protocol runs through for the firearm deems it being safe and proper, I think is inappropriate. And, I align that in my report.

(Ex. 14, Hicks dep., p. 51);

Q.    All right.  Can you describe what analysis you undertook in reaching your conclusion that Ms. Hilton's gun fired without trigger being pulled?

A.    Well, it was my examination of the gun, seeing the excess material, the videos that I've seen, they all seem to be the same, that they've discharged without a trigger pull.  Some of the measurements, the difference between the striker foot height versus the sear height.

. . .

Q.    And in Ms. Hilton's pistol, the components that have this excess material that you've identified that are relevant are the striker foot?

A.    Correct.

Q.    The sear, sear face?

A.    Right.

---

[7]    Q.    Do you do any testing for accidental discharges?

MR. GIBSON:· Object to form.

A.    I'm not sure how that type of testing would even be performed, to be honest with you.

(Ex. 21, pp. 114-115, Toner testimony).

**Q.** The safety lock tab?

**A.** Correct.

**Q.** What else?  Is there excess material on the striker wall or stop?

**A.** Yes.  It's deformed.
…

**Q.** But either way it is your belief those should be secondarily machined to smooth them out?

**A.** Correct.

**Q.** Other than those four components, the striker foot, the sear face, the safety lock tab, and the striker wall, any other components that contain excess material that relevant to allowing an un-commanded discharge?

**A.** In this particular gun, no.

**(Ex. 15, Villani dep., pp. 85-86, 114).**

8.      Sig allegation: "In addition to Villani and Hicks, Plaintiff also disclosed the expert report of Jonathyn Priest. *See* Priest Report (Ex. H). However, Priest was only retained to perform a trajectory analysis and does not offer opinions regarding defects or causation. *See* Priest Report (Ex. H); Priest Dep. in Hilton at 9:21-10:11; 20:20-21:9 (Ex. I)."

**Response:**

**Admitted that Priest does not offer opinions on the defects in Hilton's gun.  Denied to the extent it implies that Priest did not conclude that Hilton's P320 discharged without trigger actuation.**

**(Ex. 1, Priest report, ¶¶ 39-40: "39.  The evidence and provided materials support, to a reasonable degree of technical certainty, that the holstered Sig Sauer P320 carried by Detective Hilton discharged without manipulation of the triggering mechanism.  40. The evidence further supports, to a reasonable degree of technical certainty, that the holstered firearm was in a position comparable to that expected with a holstered firearm at the moment of an unintentional discharge").**

9.      Sig's allegations: "As a result, neither Villani nor Hicks can point to any objective evidence to demonstrate that—even if their purported design and manufacturing defects did exist—such defects could cause a P320 pistol to discharge without a trigger pull."

**Response:**

**Denied.** Hicks and Villani point to Sig's own press releases, testing videos, real world replication of the P320 discharging across the country without trigger pulls, as well as eyewitness and deposition and affidavit testimony. (See, e.g., Ex. 16, Manteca eyewitness statement; Ex. 17, SETPA affidavit; Ex. 18, Officer Jacklyn deposition testimony[8]; Ex. 19, videos of P320 discharging in: Honesdale, PA; Milwaukee, WI; Rose Casino, LA; Roscommon, MI; Philadelphia, PA; and Saint Clare, MI).[9]

1. *Roscommon, Michigan February 2016.*

From 6:00 minute mark on:

https://vimeo.com/geomatrixproductions/review/327346849/4f8af65fc0

(password: richardson320).

Sig claims that the Roscommon department found that the officer's seatbelt buckle somehow dove into the officer's holster and pulled the trigger. But the video clearly shows in several frames that the seatbelt is in place and fully retracted. In addition, a reflection of the officer standing stunned outside his patrol car shows his holstered P320 has nothing attached to it. (Ex. 24). The officer himself states in the video that the seatbelt did not make his gun fire and notes that the casing did not eject. In September 2022, the district court in New Hampshire found this video to be persuasive evidence that the P320 can discharge without a trigger pull.[10]

The officer's contemporaneous reaction and dialogue with an on-scene Conservation

---

[8]     Q.      Can you describe how you did that physically?
        A.      What happens is, is that, you know, we have a lot of gear on and everything, so you shift your weight and you lift up. I use the steering wheel as a leverage point to get out, and at that particular moment, that's exactly when apparently the weapon discharged.
        Q.      How many hands did you have on the wheel when you were trying to raise up?
        A.      Both hands.
        Q.      Both hands?
        A.      Both hands on the wheel. We look around. We don't see any blown-out tires. I notice a hole in the front of the cart, notice that my iced tea is leaking. I feel the heat from my holster. I think we got a - - I got a discharge and it's incredible.

[9]     Due to the length of these videos and any difficulty viewing them from the links, plaintiff will also file a flash drive with the Clerk's Office.

[10]    "As discussed, the court found credible Guay's testimony that he did not pull the trigger, and the video of the Roscommon incident was persuasive in showing that a P320 can fire without a trigger pull." (Ex. 4, p. 13, fn. 2).

Officer was as follows:

[*gunshot*]

RICHARDSON: What the hell? You explain to me how a gun goes off getting out of the car.

OTHER OFFICER: Huh. What?

RICHARDSON: Yea.

OTHER OFFICER: No shit.

RICHARDSON: Holy shit.

OTHER OFFICER: Scare the shit out of you huh?

RICHARDSON: Something hit my leg. I don't know if I'm shot or what but …

OTHER OFFICER: Looks like your hip.

RICHARDSON: You're my witness man. I'm glad I got a witness. Look at that you tell me how that goes off?

OTHER OFFICER: Holy shit. I don't know man. That's bizarre. You were just standing up and it went off.

RICHARDSON: Yea, I was just getting out of the car.

OTHER OFFICER: Good thing it didn't get your frick'n *(inaudible)*.

RICHARDSON: Holy shit man.

OTHER OFFICER: Or your hand. I'm not a big fan of Glocks.

RICHARDSON: It's not a Glock it's a SIG.

OTHER OFFICER: Oh, it is?

RICHARDSON: I am going to take this out and unload the damn thing. It even wrapped another one in. Oh no, it didn't. That's a discharged round.

RICHARDSON: Can I get your name?

OTHER OFFICER: Yea. Get you my card.

RICHARDSON:          Whoa. That could have ruined my whole goddamned day.

OTHER OFFICER:      Explain that to the sheriff, eh?

RICHARDSON:          Yea.  I am so glad you're here man.  Could you imagine having to expaint that, hey, I was getting out of the car, and it went off.  And they're going to be like, are you serious?  Wow, that hurt.  That stung.

I just for the life of me can't figure out how that went off.

OTHER OFFICER:      Yea, because there's no, uh, your seatbelt wouldn't have hit that.

RICHARDSON:          No, I mean, the trigger was completely covered. I don't know. Honestly, I don't know. No idea. Like I said, I'm glad you were here, man, you're my witness.


2.      *Southeastern Pennsylvania Transportation Authority (SEPTA) officer Suburban Station, Philadelphia August 2019.*

The incident has just occurred when the video begins.  At 2:20 to 2:40 mark the officer expressly states that the gun is still holstered.

   https://www.dropbox.com/s/rp5kmsth6xp0zcb/SEPTA000083.AVI?dl=0

3.      *Undercover Milwaukee officer in police department parking lot, Milwaukee, Wisconsin January 2021.*

Discharge is around 1:20 mark.  The officer's hands are full.  The gun launches out of the holster as he exits the car.  The gun hits the side of his car and goes up in the air and then falls to the ground.

   https://www.dropbox.com/s/xdrs8gzkwgy222k/clip0001.avi?dl=0

4.      *Saint Clare Prison, Detroit, Michigan August 2021.*

The discharge occurs early in the video.

   https://www.dropbox.com/s/qv4iszuuyety5dl/2021septclip0243.avi?dl=0

The agent's finger is clearly outside his holstered P320 when it discharges.  (Ex. 21).

5.    *Rose Casino, Louisiana, December 5, 2021*

Off-duty ICE agent's p320 discharges as she moves her handbag toward a casino gaming

table.  Occurs at 50 second mark.

https://www.dropbox.com/s/3486c7sfdd97pgu/Rose%20Casino%20St.%20Rose%20Lousiana%20December%205%202021.mp4?dl=0

6.    **Honesdale, Pennsylvania, February 2022.**

The officer's hands are nowhere near the holstered P320 when it discharges as he exits

patrol car.

https://www.dropbox.com/s/po7v94qx61ax3j4/Honesdale%20PA%20-%20February%207%202022%20Unblurred.mov?dl=0

10.    Sig's allegation:  "Neither Villani nor Hicks undertook any efforts to rule out the most likely cause of the pistol discharge—a trigger pull. Indeed, Villani did not speak with Plaintiff or read her deposition, nor did he speak with any of the officers who were present immediately after the discharge occurred. *See* Villani Dep. in Hilton at 17:1-7. Nor did he examine any of the items that were in Plaintiff's purse at the time of the discharge to determine whether they could have caused the trigger to be pulled. *See* Villani Dep. in Hilton at 117:9-20. He did not review any materials relevant to the case or undertake any independent efforts to determine what happened. *See* Villani Dep. in Hilton at 5:14-18, 7:19-24; 19:20-20:9.

**Response:**

**Hilton objects on the grounds that the allegation of allegedly undisputed fact is argumentative.  Nothing in the case law required either to "rule out" a trigger pull though each has to a reasonable degree of certainty.  Having stated the objection, the allegation is denied.  Both experts reviewed the scene photos, reports, CT scan images, and deposition testimony.  Ms. Hilton's purse was not inspected by either side.  Both sides instead relied on photographs.  Sig's experts did not speak personally with Detective Hilton either.  Such a conversation is not necessary for an expert opinion to be formed based on the evidence.**

11.    Sig's allegation: "Similarly, although he reviewed the transcript of Plaintiff's deposition, Hicks never spoke with Plaintiff or any of the Bridge City Police Department officers who were present immediately after the discharge occurred and carried out the department's investigation of the discharge. *See* Hicks Dep. in Hilton at 126:2-13. Hicks did not undertake any efforts to determine whether any of the other items in Plaintiff's purse could have caused the discharge by inadvertently actuating the trigger. *See* Hicks Dep. in Hilton at 111:1-4. Moreover, Hicks admits that he did not perform numerous tests that should have been performed to determine whether the pistol can fire without a trigger pull. *See* Hicks Dep. in Hilton at 50:1- 51:22. Further, neither

Villani nor Hicks provide any opinion regarding a reasonable alternative design for the P320 pistol. *See* Villani Report (Ex. F); Hicks Report (Ex. G).

**Response:**

**Hilton objects on the grounds that the allegation of allegedly undisputed fact is argumentative. Having stated the objection, the allegations are denied. Hicks report shows in detail the detailed data he relied on in forming his opinion, including detailed component drawings of the P320, thousands of pages of background documents, Hilton's deposition, exhibits from Hilton's deposition including the incident report, and videos of un-commanded discharges of the P320:**

*Hilton v. SIG Sauer*
*Project No.: 2017*

*Classification Description*

*1. Background from Client*
*SIG-DB_000001-000812*
*2. Background from Client*
*SIG-DRAWINGS_000001-000371*
*3. Background from Client*
*SIG-QC 000001-000092*
*4. Background from Client*
*https://abcnews.go.com/Nightline/video/detective-sues-sigsauer-holstered-p320-pistol-wounded-79633594*
*5. Background from Client*
*https://abcnews.go.com/US/detective-sues-sig-sauerholstered-p320-handgun-killed/story?id=79605906*
*6. Deposition*
*Deposition of Brittany Hilton taken 07/12/2022 with exhibits*
*7. Inspection*
*Inspection photos and CT scans*
*8. Legal*
*Plaintiff's Original Complaint*
*9. Video*
*Miscellaneous videos re un-commanded discharges*

**(Ex. 14) (attachment B).**

**Hicks, moreover, does identify the reasonable alternative design to the safety-less P320 Hilton was issued, as discussed *infra*. Neither side has conducted any laboratory testing replicating the exact circumstances of Hilton's discharge or any other P320 discharge, i.e., putting a robot on a treadmill with a holstered P320 and having it walk for months or years until the striker foot/sear face interface fails. That kind of testing would be so astronomically expensive as to be impossible and would spoliate the weapon at issue.**

**Hilton's experts are not required to go to that length to form an opinion especially when there is overwhelming evidence of real-world replication of the P320 firing without a trigger pull. "Examination and/or testing of an exemplar of the same product, in combination with a review of photographs of the allegedly defective product and/or testimony regarding the circumstances and nature of the allegedly defective product's failure, may, in some cases, constitute an entirely adequate and reliable methodology for an expert to employ, especially where examination or testing of the allegedly defective product itself is impossible, impracticable, or would implicate issues of spoliation".** *Peters-Martin v. Navistar Int'l Transp. Corp.,* **410 F. App'x 612, 620 (4th Cir. 2011).**

**IV.     Applicable Law**

**A.     The Summary Judgment Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is only appropriate when "view[ing] the facts in the light most favorable to the non-movant" and "draw[ing] all reasonable inferences in [his] favor," "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Familias Unidas Por La Educacion v. El Paso Indep. Sch. Dist.,* No. EP-20-CV-170-DB, 2022 WL 4923349, at *2 (W.D. Tex. Oct. 3, 2022), citing *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (quoting Fed. R. Civ. P. 56(a)).   A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (per curiam). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict of the nonmoving party." *Id.*

**B.     Other Similar Incidents (OSI) may be offered as evidence of notice or defect**

Other similar incidents "are admissible evidence provided that the other incidents must

have occurred under reasonably similar (though not necessarily identical) conditions. 'Reasonably similar circumstances' generally means the same type of occurrence. To prove the proper predicate in a product defect case, the proponent of the evidence must establish that the defect that caused the other incidents was similar to the defect alleged in the case at hand. Evidence of similar incidents is inadmissible if it creates undue prejudice, confusion or delay. Prolonged proof of what happened in other accidents cannot be used to distract a jury's attention from what happened in the case at hand. The relevance of other accidents depends upon the purpose for offering them. Other accidents may be relevant to show whether a product was defective or unreasonably dangerous or that a manufacturer was on notice of prior or continuing problems with the product. If the other accidents are offered to prove a product was defective or unreasonably dangerous, only accidents occurring before the production and sale of the product in question are admissible, not accidents occurring after, because whether a product was defective must be judged against the technological context existing at the time of its manufacture." *Est. of Muniz v. Ford Motor Co.,* No. 04-12-00263-CV, 2013 WL 2645284, at *2 (Tex. App. June 12, 2013)(internal citations and punctuation omitted).

When the same evidence is offered as proof of defect, the proponent must establish the accidents occurred "under substantially similar circumstances and involving substantially similar components." *Jackson v. Firestone Tire & Rubber Co.,* 788 F.2d 1070, 1082–83 (5th Cir.1986). Thus, to show notice the rule of admission is somewhat more relaxed than when the same evidence is used to show defect. *Id.* at 1083. As such, the Court must examine whether the evidence meets the standard to be used to prove notice and if it does, then turn to whether the evidence may also be used to prove defect. *Hendricks v. Ford Motor Co.,* No. 4:12CV71, 2012 WL 4478308, at *3 (E.D. Tex. Sept. 27, 2012).

C.    **Law of Causation**

A litigant is not required to prove causation to a mathematical certainty.  Recognizing

that the fact of causation is

> not susceptible of proof to a mathematical certainty, the law requires only that the evidence show that it is more probable than not that the harm was caused by the tortious conduct of the defendant. Stated differently, it must appear that it is more likely than not that the harm would have been averted but for the negligence of the defendant.

*Griffin v. Missouri Pac. R. Co.,* 413 F.2d 9, 14 (5th Cir. 1969), *citing Perkins v. Texas and New*

*Orleans R. Co.,* 243 La. 829, 147 So.2d 646, 648 (1962).

IV.    **Discussion**

> *Sig's Motion should be denied.  Hilton has advanced sufficient evidence for a rational jury to conclude that her P320 discharged without a trigger pull.*

A.    *Hilton has advanced sufficient evidence for a rational jury to conclude that her P320 discharged without a trigger pull.*

On this issue, Hilton incorporates by reference her Memorandum in Opposition to Sig's

Daubert challenges to her experts.  (Docket Nos. 26, 27).  Numerous videotapes, affidavit

testimony, deposition testimony, her three expert reports, and eyewitness statements support

Hilton's claim that her P320 fired without the trigger being pulled.

B.    *Hilton has advanced sufficient evidence for a rational jury to conclude that a reasonable alternative design was available.*

Sig asserts that Hilton has advanced no evidence of an alternative safer design of the

P320.  (Docket No. 28, Def. Mem. Law, p. 9).  This is incorrect.  Hicks expressly notes in his

report that a safer alternative design is not only known to Sig, i.e., one that includes an external

safety, but that it has already mass produced and sold it to the United States armed forces

five years ago:

The P320 was SIG SAUER's first striker fired pistol design, introduced in 2014, and was based on the P250 frame barrel, and magazine. In 2017, SIG SAUER was awarded a large military contract to supply two different versions of the P320 (M17 as a full size and M18 as a compact version), **but the military required a redesign to include a manual safety. No manual safety is available to non-military purchasers on the base models of this firearm.** Many other similar un-commanded (no trigger pull) discharge incidents have been reported across North America, including several different law enforcement agencies, some of which have prohibited the further use of the P320 model by their officers.

(Ex. 20, Hicks report, p. 2) (emphasis added).

This fact renders Sig's citations to various case law requiring evidence of a reasonable alternative design unavailing. The design already exists. Sig cannot credibly deny this fact.

https://en.wikipedia.org/wiki/SIG_Sauer_M17 The burden of showing an alternative design "is minimal: plaintiffs need only offer '*some* evidence that their alternative design ... would not have introduced other dangers of equal or greater magnitude." *Id.* (quoting *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337–38 (Tex. 1998)). "Texas law expects that an alternative design be tested before a jury can reasonably conclude that the alternative would prevent or reduce the risk of injury." *Casey v. Toyota Motor Eng'g Man. N.A., Inc.*, 770 F.3d 322, 332 (5th Cir. 2014). However, actually constructing physical prototypes is not required; "testing can be as simple as applying math and physics to establish the viability of a design." *Sims*, 839 F.3d at 407; *Sanchez*, 997 S.W.2d at 591. *Deason v. Ford Motor Co.*, No. A-16-CV-1191-SS-ML, 2018 WL 11346867, at *3 (W.D. Tex. May 15, 2018).

Sig's safer version, with an external thumb safety circled, is now offered for sale on its website not just to military end users, but civilians as well [next page]:



HAVE SIG BUILD YOU A CUSTOM P320. DIRECT FROM THE FACTORY.
Click here to start designing a personalized P320 now.

Home / Firearms / Pistols / P320 / P320-M17



● ● ●

# P320-M17

The same innovation and versatility as the U.S. Army's new M17 in a civilian version.

The reasonable alternative design in this case already exists and is currently in use by the United States armed forces, and civilians.  Sig's argument regarding no evidence of a safer alternative design should therefore be rejected.

V.    **Conclusion**

For the reasons stated, defendant's Motion for Summary Judgment should be denied.
.

Respectfully submitted,

Plaintiff Brittany I. Hilton

*/s/Jeffrey S. Bagnell*

_____
Jeffrey S. Bagnell
Federal Bar No. CT18983
Admitted Pro Hac Vice
Jeffrey S. Bagnell, Esq., LLC
55 Post Road West
Westport, CT  06880
(203) 984-8820
jeff@bagnell-law.com


SICO HOELSCHER HARRIS LLP
*/s/ James H. Hada*
James H. Hada
Federal Bar No. 11527
3 Riverway, Suite 1910
Houston, Texas 77056
Office:        713.465.9944
Facsimile:    877.521.5576
E-Mail:       jhada@shhlaw.com

ATTORNEYS FOR PLAINTIFF


DATED:  NOVEMBER 17, 2022

## <u>CERTIFICATION</u>

      I hereby certify and affirm that on November 17, 2022, the foregoing document was served on all known counsel of record pursuant to the Federal Rules of Civil Procedure using the ECF system.

          _____*/s/ Jeffrey S. Bagnell*_____
          Jeffrey S. Bagnell