*Tom Bevel, President*
*Ross M. Gardner, Vice President*

*Partners:*
*Tom "Grif" Griffin*
*Craig Gravel*
*Jonathyn Priest*

*Associates:*
*Kim Duddy*
*Ken Martin*



**Bevel, Gardner & Associates** Inc.
*A forensic education and consulting group.*
www.bevelgardner.com

Jeffrey S. Bagnell, Esq., LLC
55 Post Road West
Westport, CT 06880
(203) 984-8820
jeff@bagnell-law.com

**Equivocal Firearm Discharge**

| | |
|---|---|
| Plaintiff: | Brittany Hilton |
| Defendant: | Sig Sauer, INC |
| Location: | Bridge City Police Department, Orange County, TX |
| BGA Case: | BGA 22-29 TX |


## SUMMARY OF EXPERT OPINION OF JONATHYN PRIEST

1. My name is Jonathyn Priest. I am a partner, forensic analysist, and technical instructor with Bevel, Gardner and Associates Inc.

2. I currently instruct, and have instructed hundreds of law enforcement personnel, prosecutors, attorneys, and other students in the areas of shooting incident reconstruction, bloodstain pattern analysis, crime scene reconstruction, officer-involved critical incident investigations, death investigations, major case management, and interview and interrogation.

3. I have thirty-two years of law enforcement experience including assignments as the Commander of the Major Crimes Section for the Denver Police Department from 2000-2011. In this position, I had the responsibility for complex case investigations including homicide and death investigations, officer-involved critical incident investigations, sex crimes, missing persons and "cold case" investigations.

4. I developed the major case management protocols, crime scene processing protocols, and critical incident investigation protocols, including investigating use of force, for the Denver Police Department. As a lieutenant, I was the commander of 45 detectives and 6 supervisors in the Denver Police Department Major Crime Section.

5. I developed the officer-involved critical incident investigation and training protocols

   for the Denver Police Department.

6. I developed the cold case investigation and training protocols for the State of Colorado.

7. From 1994 - 2000, I was the Homicide Unit supervisor for the Denver Police Department.   I was in charge of the investigations of hundreds of homicides, death, officer-involved critical incidents and murder-for-hire cases.  I supervised many complex case investigations and trained other investigators in the area of complex case management.

8. From 1989 - 1992, I was a homicide detective investigating hundreds of homicide, death, officer-involved critical incidents, and murder-for-hire cases.

9. Since 1990 I have provided instruction in the area of crime and death scene investigation, major case management, interviewing and interrogations techniques, and critical incident command at various colleges and universities in Colorado.

10. Since 1989 I have provided instruction to the Denver Police Department and dozens of other law enforcement agencies in twenty states at the municipal, county, state and federal levels.  Instruction courses include criminal investigation of violent crimes, interviewing and interrogation techniques, crime scene and death scene reconstruction, bloodstain pattern analysis, shooting incident and crime scene reconstruction, officer-involved critical incident investigations, and major case management.

11. My experience, training, and background are more fully described in the attached curriculum vitae, which I incorporate, by reference to this report.

12. I hold memberships with the International Association for Identification (IAI) the Association for Crime Scene Reconstruction (ACSR), The International Association of Bloodstain Pattern Analyst (IABPA), and International Homicide Investigators Association (IHIA), to name a few.

13. I am a past president for the Association for Crime Scene Reconstruction.

14. I was an Assistant Tactical Firearms Instructor while with the Denver Police Department.

15. I am a Firearms Instructor for the National Rifle Association (NRA).

16. Materials Considered and Examined[1]

    a. Photographs

        i. Scene, evidence photographs, – 41 photographs

    b. Documents

---

[1] Received via Drop Box May 17, 2022.

    i. PDF File titled: Complaint as filed – 39 pgs.

    ii. Folder titled: HILTON  Brittany

        1. Folder titled: Exhibits

            a. PDF file titled: 8420744 Brittany.Irene Hilton.EXHIBIT1 – 1 page

            b. PDF file titled: 8420744 Brittany.Irene Hilton.EXHIBIT2 – 41 pages (duplicate of included photograpghs)

            c. PDF file titled: 8420744 Brittany.Irene Hilton.EXHIBIT3 – 3 pages

            d. PDF file titled: 8420744 Brittany.Irene Hilton.EXHIBIT4 – 2 pages

            e. PDF file titled: 8420744 Brittany.Irene Hilton.EXHIBIT5 – 5 pages

            f. PDF file titled: 8420744 Brittany.Irene Hilton.EXHIBIT6 – 1 page

    iii. Folder titled: HILTON  Brittany-2

        1. Folder titled: Transcripts

            a. TXT file titled: 8420744 Hilton.Brittany I. 071222_AMICUS – 116 pages

            b. PDF file titled: 8420744 Hilton.Brittany I.  071222.full – 143 pages

            c. PDF file titled: 8420744 Hilton.Brittany I. 071222.fullprint – 116 pages

            d. PDF file titled: 8420744 Hilton.Brittany I.  071222.index – 26 pages

            e. PTX file titled: 8420744 Hilton.Brittany I.  071222.ptx – cannot view

            f. PDF file titled: 8420744 Hilton.Brittany I. 071222.RSLETTER – 2 pages

            g. TXT file titled: 8420744 Hilton.Brittany I.  071222 – 116 pages

            h. PDF file titled: ERRATA – 1 page

            i. PDF file titled: Mini Transcript – 29 pages

    iv. Folder titled: Hilton, Brittany

1. Word document titled: 2021.11.12 DRAFT Joint Report-Case Management Plan (Hilton) 4890-8345-8819 1-JB edits – 7 pages
2. Word document titled: 2021.11.15 DRAFT Joint Report-Case Management Plan (Hilton) 4890-8345-8819 2-JB edits 2 – 7 pages
3. PDF file titled: Complaint as filed – 39 pages
4. Word document titled: ComplaintDRAFT – 23 pages
5. Word document titled: consent motion middle initial – 2 pages
6. PDF file titled: consent motion middle initial – 2 pages
7. PDF file titled: fee agreement – 2 pages
8. PDF file titled: Hilton v. SIG supboena NF – 3 pages
9. JPG file titled: IMG_9258 – 1 photograph
10. PDF file titled: Incident reports and Sig "inspection" – 11 pages
11. Word document titled: INITIAL DISCLOSURES – 6 pages
12. PDF file titled: INITIAL DISCLOSURES – 6 pages
13. Word document titled: Joint Report-Case Management Plan – 6 pages
14. Word document titled: notice of initial disclosures – 2 pages
15. PDF file titled: notice of initial disclosures – 2 pages
16. Word document titled: proposed order – 1 page
17. PDF file titled: proposed order – 1 page
18. Word document titled: RetainerLetter2 – 3 pages
19. PNG file titled: Screen Shot 2021-11-08 at 11.13.16 AM-1 copy – 1 page
20. Word document titled: stipulation – 2 pages
21. PDF file titled: stipulation – 2 pages
22. PDF file titled: USCOURTS-nmd-1_16-cv-01334-1 – 4 pages

17. This expert report is founded upon the materials provided. I based the opinions presented in this report upon my specialized knowledge, experience, and training as well as my continued educational research and instruction with law enforcement agencies. I recognize that there may be additional documentation as the investigation and case events develop. Should additional information become available, I reserve

the right to consider the information and to amend this report as necessary.

18. This incident occurred on December 1, 2020.

19. The firearm discharge occurred while Detective Brittany Hilton was walking past her desk to leave her office and carrying her purse on her right forearm where she had her holstered Sig Sauer® P320.

20. Detective Hilton reported, as she walked past her desk, she heard a gunshot, smelled gunpowder, and felt a stabbing pain.

21. Detective Hilton dropped her keys and purse, took a step, and fell to the floor.

22. Additional law enforcement personnel came to the aid of Detective Hilton.

23. Paramedics transported Detective Hilton to a medical facility for treatment of a single perforating gunshot wound (GSW) of the groin.

24. Captain Richard Teague reported that he observed the firearm of Detective Hilton, holstered and in her purse.

25. Captain Teague removed the firearm from the purse and observed a damaged cloth mask come out of the purse along with the holstered firearm.

26. The damaged cloth mask supported proximity to the firearm muzzle at the moment of discharge.

27. Captain Teague did not observe or report the presence of any object, device, or substance within the trigger area of the firearm.

    a. Handgun trigger actuation for properly functioning firearms requires the operator to overcome the trigger weight.

        i. Typical handgun trigger weight is between four (4) and six (6) lbs.

        ii. Some firearms (usually double action/single action) can have a trigger weight greater than 12 lbs. for the first pull.

        iii. Some handguns, adjusted for competition shooting, can have trigger weight of less than 4 lbs.

        iv. The Sig Sauer® armorer's manual lists the trigger weight for the P320 at 5.5 – 6.5 lbs.[2,3]

        v. A report within the provided materials lists the tested trigger weight of the offending firearm carried by Detective Hilton as 4.75 lbs.[4], which is

---

[2] Page 12 of SIG SUPPLEMENTAL PRODUCTION (00696901xC2E86).
[3] The trigger weight of the analyst's Sig Sauer® P320 M17 variant measured 6.2 lbs.
[4] See PDF file titled: Incident reports and Sig "inspection".

less than the advertised trigger pull weight[5].

28. The evidence recovered and documented support a single cartridge detonation in a Sig Sauer® P320 semi-automatic pistol, a single fired cartridge case located within the chamber of the firearm[6], a Blackhawk Serpa CQC® holster, a purse with contents indicating potential fired bullet damage, fired bullet fragments, a potential bullet defect of a wall, and a perforating bullet wound of the groin area of Detective Hilton.
    a. Holsters have four (4) levels of retention each for various mission requirements or personal preference.
        i. Level One retention holster: Passive retention only. Friction properties of the holster retains the firearm.
            1. Many concealed carry holsters are level one holsters.
        ii. Level Two retention holster[7]: Designed with an active retention device in addition to the passive retention properties of the holster. Common active retention includes: a thumb break, hammer loop, or trigger guard lock.
            1. The level II holsters are commonly used for open carry or law enforcement purposes.
        iii. Level Three retention holster: Incorporates an additional retention device. Usual Level III holster incorporates a thumb break or loop, plus a trigger guard lock, plus passive resistance properties.
            1. Level III holsters are commonly used for law enforcement purposes and required by some law enforcement agencies.
        iv. Level Four retention holster: Incorporates three retention devices in addition to passive (friction) retention.
            1. The level IV holster is not commonly employed by individuals who carry a firearm. Level IV holsters are often used for specific purposes or missions.
    b. In addition to maintaining a firearm safely for carry, a holster protects the firearm from undue wear, dirt, and damage, and retains a firearm in situations where a shooter might run, crawl, or roll on the ground. A holster can also keep the firearm controlled during physical altercations between the individual carrying the firearm and an uncooperative subject when firearm use, and discharge, is not necessary.
    c. The trigger mechanism of the Sig Sauer® P320 is not accessible from the

---

[5] While the measured trigger weight for the offending firearm is less than what is reported by Sig Sauer for the P320, this is not an unusual trigger pull weight for a firearm.
[6] While the report indicates that firearm "Meets Factory Criteria", the provided information fails to document whether the firearm cycled properly by ejecting the fired cartridge case and chambering the next cartridge from the magazine.
[7] The Blackhawk Serpa CQC is a level II style holster.

exposed side when the firearm was fully seated in the holster[8]. A space exists where intentional trigger manipulation, by use of small, foreign, objects can occur[9].
    i. The trigger can be pulled rearward if an object capable of contact with the trigger face is inserted and pulled rearward.
    ii. The trigger can be actuated if an object is inserted into the trigger guard and the firearm is moved to a seated position in the holster from an unseated position.
  d. When the firearm is fully seated, the ejection port of the Sig Sauer® P320 is partially exposed in the Blackhawk Serpa CQC® holster.
  e. The Blackhawk Serpa CQC® holster incorporates a positive trigger guard locking mechanism that must be defeated to allow the firearm to be removed from the holster.
    i. This locking mechanism does not interfere with the normal safety of the trigger mechanism and does not touch the trigger[10].
  f. Rearward motion of the slide mechanism occurs during a normal ejection cycle.
  g. The Sig Sauer® P320 located within the purse of Detective Hilton did not eject the fired cartridge case after firearm discharge.
  h. A malfunction of this type typically relates to some hindrance of the slide, which results in the failure to eject [a fired cartridge case].

29. Firearm manipulation requires the individual handling the firearm to follow a set of safety rules.

30. The National Rifle Association (NRA) present three (3) basic rules during its firearm training courses.

  a. **Rule 1:** Always keep the gun pointed in a safe direction.
    i. This is listed as the primary rule by the NRA.
  b. **Rule 2:** Always keep your finger off the trigger until ready to shoot.
  c. **Rule 3:** Always keep the gun unloaded until ready to use.

31. NRA basic firearm training courses are not designed as tactical or defensive firearms courses.

---

[8] See photograph IMG_0754.
[9] This space is similar to the space existing with other holster types used with various makes and models of firearms. Unintentional trigger manipulation cannot be completely eliminated; however, no evidence of such manipulation is observed or documented within the provided materials.
[10] This analyst possesses and uses the Blackhawk Serpa CQC® holster for three (3) different firearms and is familiar with its operation and safety mechanisms.

32. Law enforcement firearm trainers use a similar set of firearm safety rules. These rules are often posted within the training facility.
    a. **Rule 1:** All guns are always loaded.
        i. The purpose of the rule is to instill a mindset for an officer that no firearm they handle is completely safe.
    b. **Rule 2:** Never let the muzzle cover anything you are not willing to destroy.
        i. Muzzle control applies directly to a deployed firearm irrespective of the reasons for its utilization.
            1. A deployed firearm is one that is drawn from a holster or other safety environment, held by an individual, and used as intended, cleaned, or maintained.
        ii. A firearm that is holstered properly, lying on a table, or stored correctly poses no danger to anyone.
        iii. It is only when the firearm is handled that a risk exists.
        iv. This rule of keeping the muzzle (front) pointing in a safe direction applies in self-defense, practice, and daily handling.
    c. **Rule 3:** Keep your finger off the trigger until on target and ready to fire.
        i. The trigger is the number one safety device for any firearm.
        ii. The purpose of the trigger is the mechanical device designed to cause firearm discharge.
        iii. Trigger discipline is repeatedly reinforced by firearm instructors regardless of the level of experience of the student.
        iv. When drawing or handling a firearm, the shooter must place the index finger straight along the side of the frame.
        v. The shooter must not discharge the firearm unless the sights are on the target and the conscious decision to fire is made.
    d. **Rule 4:** Be sure of your target and what lies beyond.
        i. In stress induced situations a shooter can experience a number of physiological conditions. These include but are not limited to:
            1. Auditory exclusion.
            2. Peripheral vision reduction.
            3. Misperceived time.
            4. Memory and perception interference.
        ii. Training mastery aids a shooter to improve skill, competence, and confidence levels.
        iii. Training mastery reduces the effects of the listed physiological conditions.
33. Each rule is necessary for the safe operation of a firearm being used as designed.
34. Each rule depends on the others for the highest levels of safety.
35. Law enforcement trainers consistently discuss and reinforce trigger discipline to avoid

unintentional discharges by trainees.
36. Muzzle control is paramount for firearms out of the holster and in the hand of the shooter.
    a. The primary function of a holster is to allow safe carry of a loaded firearm.
    b. Many concealed carry holsters, by design, place the firearm in a position where the firearm is close to the body and in a position exposing the firearm muzzle to critical body areas.
        i. Areas include but are not limited to:
            1. The waist (anterior and posterior)[11], lateral chest, leg, and ankle.
    c. Tactical training requires officers to draw, fire, and re-holster while maintaining visual assessment on the target. This action requires sound muscle memory and trigger control. Inevitably, the muzzle likely covers some part of the body when using a concealed carry holster.
    d. Individuals who properly maintain and deploy a firearm depend on and trust the firearm is functioning properly when the shooter employs effective trigger discipline while handling the firearm.
    e. Reasonable firearms users have confidence and a belief their firearm will not discharge unless the trigger is pulled.
37. A firearm having the potential for unintended self-discharge cannot be carried safely while loaded.
38. Concluding my evaluation, I reasoned the following based on the available and provided materials, evidence, my training, experience, and background to a reasonable degree of technical certainty:
    a. Modern handguns are designed to discharge upon the rearward pull of a triggering mechanism.
        i. Page 19 of the Sig Sauer® armorer's manual addresses the trigger system.
        ii. 1.5 states the Sig Sauer® P320 pistol discharges by pressing the trigger rearward.

---

[11] Sig Sauer® has postings on its various web sites (e.g., Facebook©) and in video training (YouTube©) depicting "appendix carry" holsters. It is very apparent that the muzzle of the firearm has a definite potential for exposure and contact with waist area body parts. This is a common carry option for law enforcement and citizens. The emphasis on eliminating unintentional discharge with such carry options is trigger control. Sig Sauer® also depicts individuals carrying firearms in standard strong-side belt holsters. These photographs associated with Sig Sauer® products routinely show the muzzle of the firearm covering the thigh and upper leg of the wearer.

   iii. I found no information within the Sig Sauer® armorer's manual stating or suggesting the firearm discharges or is designed to discharge by means other than rearward trigger manipulation.

   iv. The press release of Sig Sauer® dated August 4, 2017, states, "All Sig Sauer pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed."[12]

   v. The Sig Sauer® press release date August 4, 2017, further delineates circumstances where a Sig Sauer® handgun might discharge unintentionally. This list incorporates acute circumstances involving shocks, vibrations, and repeated dropping of the firearm. Such circumstances can occur occasionally in the field of law enforcement in areas such as physical altercation, running, pursuit driving, jumping fences, attempting an arrest, and ground fighting to name a few.

   vi. The provided materials fail to support the Sig Sauer® P320 of Detective Hilton was exposed to "acute conditions" beyond normal law enforcement physical actions.[13]

 b. Modern handguns incorporate devices and mechanisms into the firearm to prevent inertia discharges when a firearm is dropped[14].

 c. The evidence supports an unintentional firearm discharge resulting in ballistic trauma to the body of Detective Hilton occurred during the handling of an appropriately holstered semi-automatic Sig Sauer® P320 pistol.

 d. The evidence supports the muzzle to target distance was within the space necessary for the deposit of visible gunshot residue.[15]

---

[12] PDF file titled: SigPressReleases, page 1 paragraph 3

[13] Having worked as a uniformed field officer and investigated hundreds of law enforcement and non-law enforcement firearm discharge incidents, I have not encountered an incident where the firearm discharged where the triggering mechanism was not manipulated, or a defect of the firearm/ammunition was not discovered.

[14] Inertia discharge inhibitors also benefit law enforcement officers involved in occasional dynamic law enforcement activities (e.g., jumping, fighting, running)

[15] When a firearm discharge occurs, burned and unburned powder as well as other debris is forcibly ejected from the barrel. This discharged debris deposits on various surfaces in differing patterns depending on the distance the muzzle is from a target surface. Sooting is normally observed when the muzzle is contacting the target surface to 18 inches from the target. Stippling is normally observed when the muzzle is between 18 – 36 inches from the target surface. These distances can vary. *This type of testing refers to muzzle to target distance testing where the firearm is held perpendicular to the target surface.* Testing of the offending firearm can determine the true muzzle to target distances for the particular firearm.

    i.  Damage to the cloth face mask supports contact or near contact with the firearm muzzle at the moment of firearm discharge.[16]

 e.  The Blackhawk Serpa CQC® holster of Detective Hilton, recovered after the discharge, presents a trigger guard lock which prevents large object (e.g., finger) insertion into the trigger guard or actuation of the trigger while a firearm is properly holstered. The trigger guard of the Blackhawk Serpa CQC® holster incorporates a positive retention device that must be defeated to allow removal of the firearm from the holster.

 f.  While it is possible to insert a small object into the trigger guard space, such manipulation is highly unlikely considering the described actions of Detective Hilton and the sequence of events necessary to achieve rearward trigger pull.

    i.  No evidence of such manipulation potential is present in the photographs, physical evidence, and materials provided.[17]

 g.  Marks and defects observed and documented on the surfaces of the P320 by Sig Sauer during its inspection[18] of the firearm recovered from Detective Hilton support motion interaction to the trigger mechanism and firearm frame by unknown objects and circumstances.

    i.  The firearm was photographed after the firearm discharge event by law enforcement and offer an ability to compare these photographs to those taken during the Sig Sauer inspection.

    ii.  A mark documented to the right-side frame of the Sig Sauer® P320 during the Sig Sauer inspection is not observed on the frame of the Sig Sauer® P320 when documented by law enforcement after the discharge event.[19]

---

[16] Photographs of the purse and other items damaged by the fired bullet were not adequately photographed or documented to analyze potential powder patterns associated with a firearm discharge. An appropriate reconstruction of the firearm position in the purse and the associated trajectory for the fired bullet did not appear within the provided materials.

[17] While the argument that a face mask string (or other similar object) could enter the trigger guard, entangle around the trigger, be pulled, and then discharge the firearm, the observed and documented evidence fails to support such a scenario.

[18] See PDF file titled: Incident reports and Sig "inspection"

[19] See PDF file titled: Incident reports and Sig "inspection" page 10, photograph IMG_0774, photograph IMG_0776, and photograph IMG_0777.

       iii. An apparent corresponding mark to the inner surface of the Blackhawk Serpa CQC® holster documented during the Sig Sauer inspection appears to suggest simultaneous creation.[20]

       iv. The presence of markings, (e.g., scratches) within a polymer holster where a firearm is removed and replaced is common and expected.

  h. These unknown objects and circumstances capable of creating the later observed and documented markings were not observed, present, or documented at the moment the firearm discharge occurred, and were not observed or documented during the subsequent investigation and analysis of the firearm discharge by law enforcement or during the Sig Sauer inspection.

       i. The inspection report asserts, "[I]t appears a foreign object entered the trigger guard causing the pistol to discharge". There is no discussion regarding other possible of potential causes of the observed damage or markings.

       ii. The strongest statement made in the inspection report is, "[W]here a foreign object might be expected to contact the trigger guard after trigger has been fully depressed."

          1. Here again, there is no discussion within this inspection report regarding other possible of potential circumstances that could result in a firearm discharge.

  i. Inspectors with Sig Sauer failed to consider the possibility of unintended discharge and therefore failed to conduct a thorough scientific analysis of the offending firearm.

39. The evidence and provided materials support, to a reasonable degree of technical certainty, that the holstered Sig Sauer® P320 carried by Detective Hilton discharged without manipulation of the triggering mechanism.

40. The evidence further supports, to a reasonable degree of technical certainty, that the holstered firearm was in a position comparable to that expected with a holstered firearm at the moment of an unintentional discharge.

41. I am unaware of additional or existing documents or materials I might be asked to review. If so requested, I shall reserve the right to supplement the opinions stated within this affidavit and report.

---

[20] Law enforcement photographs of the holster did not appear within the provided materials. Analysis and comparison of this mark could occur. It is unknown if the mark pre-existed the Sig Sauer inspection.

This report is signed under penalty of perjury on this 14th day of August 2022, in Denver, Colorado.

_____

Jonathyn W. Priest