UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS, BEAUMONT DIVISION

| | § | |
|---|---|---|
| BRITTANY I. HILTON, | § | CIVIL ACTION NO.: 1:21-cv-00441 |
| | § | MJT |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SIG SAUER, INC., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION AND ALTERATION OF EVIDENCE INCLUDING A DEFAULT JUDGMENT OR, IN THE ALTERNATIVE, AN ADVERSE INFERENCE INSTRUCTION

Plaintiff Brittany I. Hilton files this Motion for Sanctions for intentional spoliation and alteration of evidence by defendant Sig Sauer, Inc. (hereinafter "Sig") pursuant to the court's inherent authority to sanction litigation misconduct.

### Statement of Issues to Be Decided by the Court

First, whether Sig spoliated key evidence in this case - - the Hilton P320 - - by taking possession of it in December 2020 and unilaterally "inspecting" it knowing full well that it would likely be the subject of future litigation, as others already were in many other cases around the country.

Second, whether Sig altered material evidence in the case - - the Hilton P320 - - by imposing scratch marks on the gun that are nowhere visible in the photos of the gun taken by Hilton's police department immediately after the incident on December 1, 2020.

Hilton contends that the answer to both questions is yes, and that Sig's spoliation of her gun is part of national pattern and practice of seizing P320s before foreseeable litigation ensues, "inspecting" them unilaterally, and then declaring that a "foreign object" got inside the holster and trigger guard and made the gun fire.

In this case, Sig's proffered experts have admitted that they have no real idea what made her holstered gun fire inside a purse.

### Factual Background

In January 2014, the Sig P320 was introduced in North America. It was the first striker-fired weapon it produced, an advanced, single-action design in which the gun is under constant, internal spring pressure to fire like a sling shot or bow and arrow. It has no external hammer but an internal "striker" that is under spring pressure to fly forward and hit the rear of a round once the slide is racked.

Since its inception, there have been at least, according to Sig's accounting,[1] 99 reported un-commanded discharges of the P320 involving federal agents, state and local police officers, and civilians, the latest in Milwaukee, Wisconsin. Approximately 19 lawsuits have been filed by more than 60 individual plaintiffs, and three class actions, against Sig alleging that the P320 is defective, poorly made, and dangerous.[2]

In recent deposition testimony, Sig corporate representatives have admitted that the company had knowledge of asserted involuntary discharges of the P320 as early as February

---

[1] The number is now 99 (up from 55) given Sig's recent disclosures of 44 additional incidents on April 26, 2023.

[2] Exhibit citations in this section are to Hilton's opposition to Sig's Motion for Summary Judgment except where otherwise indicated. Docket No. 35.

2016, more than five years ago. Yet it has never issued a recall or safety warning since that time despite doing so for other Sig products the company deemed susceptible to un-commanded firings. (Ex. 6, Safety Warning and Mandatory Recall notice for Sig "predator" rifle").

Hilton, a 39-year-old detective, 11-year veteran of the Bridge City Police Department, and mother of four, incurred severe and permanently disfiguring injuries when her spring-charged SIG Sauer P320 X-Carry pistol discharged while fully holstered in her handbag and shot her December 1, 2020. The bullet entered just to the left of her vagina, narrowly missed her femoral artery, traversed her pelvis front to back and exited her bottom after leaving shrapnel near and around her sciatic nerve.

Due to the gunshot, Hilton has incurred nerve damage in the form of pain radiating down her leg and spreading to her knee, and severe emotional trauma. She has a visible entrance wound next to her vagina and a visible exit wound on her bottom. The exit wound sits on top of her coccyx and she is unable to sit for very long without shifting back and forth to attempt to relieve unremitting pain. She will probably need additional future surgery because the injury forces her to favor her left leg over her right. (Ex. 8, Hilton dep., pp. 57-59; 76-77, 80-82, 88).


[next page]



(Ex. 9).

It is not credibly disputed that Hilton's P320 was fully inside its holster at the time her gun fired. The contemporaneous incident reports all place the P320 inside Hilton's handbag and holster. Sean Toner, the P320's designer and one of Sig's experts, testified in November 2022 that he "did not know" what made Hilton's gun fire. (Exhibit 10, Toner dep., p. 50 "I don't have a knowledge of what pulled the trigger").

Derek Watkins, another Sig expert, also recently testified that because in his estimation it is impossible for the P320 to fire without a trigger pull, "something" or someone must have pulled the trigger in every instance. (Ex. 11, Watkins dep., p. 25 "the gun will not discharge absent a trigger pull").[3] His is a true *ipse dixit* argument, i.e., because he says the Sig P320 can never malfunction - - despite substantial video, eyewitness and Sig press release evidence to the contrary, it necessarily follows that "something" must have pulled the trigger. He admitted that he did not test or replicate the circumstances of the discharge in a closed handbag such as Detective Hilton was carrying that morning:

> Q. Was there any attempt to recreate the actual incident, in terms of putting a holstered P320 in a purse with other objects in it at any time?
>
> A. No. I wasn't part of any if there were.

(Ex. 11, p. 22);

and that he, like Toner, does not know what made Hilton's P320 fire:

> Q. Well, what do you think pulled Ms. Hilton's trigger?
>
> A. We don't have enough information to lock it down to any one thing because there were no witnesses other than Ms. Hilton, who didn't see the gun actually discharge, according to her testimony. So the thing is we don't have enough information.

---

[3] The New Hampshire district court, as previously noted, found this testimony "unpersuasive." ("To the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive").

5

(Ex. 11, pp. 24-25).

The incident report, authored by Bridge City Captain Richard Teague the following day, states that he removed Hilton's holstered P320 as it was resting in the handbag. He noted that there was nothing on top of the pistol nor anything in the holster area of the gun that he could see after he removed it from the purse:

> I looked at the pistol while it was inside the purse, *I did not see anything on top of the pistol.* When I was looking at the purse I was still on my knees and I had turned to my left and was looking over my left shoulder. The pistol grip to the pistol was closest to me; the bottom of the magazine was closest to me and towards the ground. I saw the rear sights. The "paddle" portion of the holster was oriented to the window side of the office[r]. I removed the pistol and holster slowly from inside the purse and ***there was not anything in the trigger area of the holster that I could see.*** A blue cloth mask came out of the purse as I removed the pistol. The mask had a hole in it and as I removed it, it came from the barrel end of the pistol and holster.

(Ex. 12) (emphasis added).

Teague affirmed these facts in his later deposition testimony:

A. And so her purse was over on to my left side. I did remove the pistol from her purse. I notice when I pulled it out, it was in the holster. There was nothing that was in the trigger guard at that time. There was a - - with the COVID, there was a blue mask, and I could tell that it had been towards the end of the holster, not where the - - the grip of the pistol was, but the barrel end of where the holster was because of the bullet hole in it and how it was kind of wrapped kind of around the end of the barrel, like where it just laid on top of it and the mask was on the barrel end of it.

…
Most of the mask, and as far - - the best I can recall, even where the loops were, it was all towards the barrel end. It wasn't - - if you on the - - in the picture of where the release is, on the side of the - -

Q. The magazine release?

A. No, ma'am.

Q. Oh. I'm sorry. Oh.

A. On the actual holster to release it. I remember most of the mask being on that end – not near the trigger, not near the grip of the pistol, and not near the magazine, but more towards the end of the actual - - the barrel end of the holster and the pistol.

6

> …
>
> Q. Do you have any issues or concerns with your personally owned P320?
>
> A. I don't carry it anymore; no, ma'am.
>
> Q. Why don't you carry it anymore?
>
> A. As long as I've been around firearms, I need to make sure it's going to do the job that it's supposed to do. And after this incident, I have heard of several other incidents, so I'm just not quite sure.

(Ex. 22, Teague dep., pp. 10, 17-18, 46).

Hilton, as a detective charged with interviewing sex assault victims, testified that she kept her holstered gun in her purse frequently to make victims feel more comfortable. No Bridge City Police Department policy or Sig P320 manual provision prohibited transporting a holstered P320 in a handbag or other container:

> Q. Did you often carry your gun in your purse in that timeframe?
>
> A. Yes.
>
> Q. Okay. And for how long had you carried your gun in your purse?
>
> A. Well, it was dependent on the - - if I was doing an interview or what - - what my day entailed. I would either carry - - so I mean one or two times a week, it was in my purse … mostly if I was going to interview someone, like if I was going to have someone come in my office and needed a comfortable environment or I felt more that they would relate to me more so if I didn't have my gun on my hip, you know.

(Ex. 8, Hilton dep., pp. 27-28).

## **Facts Showing Spoliation and Alteration of Evidence**

On December 1, 2020, the day of the incident, Assistant Chief Bergeron of the Bridge City Police Department took photographs of the Hilton P320, her purse, the contents of her purse, and her office. Ex 1 to this Motion, p. 1. The photos of her gun that day show no diagonal "scratch" mark or gouges:



*Id.*

On December 3, 2021, Bergeron contacted Sig Sauer and spoke to employee Todd Rassa, who sent a shipping label to Bridge City PD to ship the gun to Sig in New Hampshire. Ex. 2 to this Motion. At the time, Sig was in litigation regarding the P320 discharging without a trigger pull around the country, and it was therefore at least foreseeable if not probable that the Hilton discharge into her pelvic region would result in litigation.[4]

Larochelle's deposition testimony, given as a Rule 30(b)(6) corporate representative,[5] confirmed not only an awareness of other P320 litigation, but that Sig had imposed litigation holds on other P320s, but not Officer Hilton's:

BY MR. BAGNELL:

```
7   Q.   All right.  Going back to this, Mr. Larochelle, going
8        back to the beginning.  Mr. Shawver to Mr. Jankiewicz,
9        you know, from Todd Rassa.
10       You've been at Sig for quite some time, right,
11       Mr. Larochelle?
12  A.   Yes, sir.
13  Q.   All right.  And you and I had a deposition four years ago
14       in the Vadnais case.  Do you remember that?
15  A.   Yes, sir.
16  Q.   And Ms. Dennison's firm was with you at that time.
```

---

[4] Sig had been sued in the following courts, among others, for injuries caused by the P320 before the Hilton discharge on December 1, 2020:

*Sheperis v. Sig Sauer, Inc.*, 3:17-cv-01318 (D. Conn.);
*Vadnais v. Sig Sauer, Inc.*, 1:18-cv-00540 (EDVA);
*Ahern v. Sig Sauer, Inc.*, 1:21-cv-11007 (D. Mass.);
*Slatowski v. Sig Sauer, Inc.,* 21-cv-00729 (Ed. Pa.);
*Jinn v Sig Sauer, Inc.*, 1:20-cv-01122 (SDNY);
*Mayes v. Sig Sauer, Inc.*, 1:19-cv-00146 (W.D. Ky.);
*Guay v. Sig Sauer, Inc.*, 20-cv-736 (D. NH.);
Powers v. Sig Sauer, Inc., 8:20-cv-02026 (MD. Fl.).

As a result, Sig cannot credibly claim that it was unaware of its obligation to refrain from spoliating or altering evidence in the *Hilton* case.

[5] ("Under Rule 30(b)(6), [the organization] has an obligation to prepare its designee to be able to give binding answers on behalf of [the organization]. If the designee testifies that [the organization] does not know the answer to [deposing attorney]'s questions, [the organization] will not be allowed to effectively change its answer by introducing evidence during trial. The very purpose of discovery is to avoid trial by ambush."). *KaZee, Inc. v. Raimer*, No. 4:19-CV-00031-KPJ, 2020 WL 6382631, at *4 (E.D. Tex. Oct. 30, 2020).

| 17 | | Mr. Joyce.  Do you remember that? |
| 18 | A. | Yes, sir. |
| 19 | Q. | And I assume -- you know that case went to a trial in |
| 20 | | Virginia? |
| 21 | A. | Yes, sir. |
| 22 | Q. | And I assume you're aware of other allegations of the |
| 23 | | P320 drop firing at different times around the country? |
| 1 | A. | Yes, sir. |
| 2 | |  MS. DENNISON:  Objection to form and scope. |
| 3 | | |
| | | BY MR. BAGNELL: |
| 4 | Q. | **And that there's been litigation about it?** |
| 5 | | MS. DENNISON:  Objection to form and scope. |
| 6 | | MR. BAGNELL:  You can answer. |
| 7 | | **THE WITNESS:  Yes.** |
| 8 | | |
| 9 | Q. | I want to ask you.  Because it seems to me, when these |
| 10 | | events continue to happen -- and I understand it's Sig's |
| 11 | | position it doesn't happen very often, but when they are |
| 12 | | alleged to happen, it seems that the gun is sent to you, |
| 13 | | Mr. Larochelle, or your department, and you go ahead and |
| 14 | | you handle it, you unpack it, you inspect it, you shoot it. |
| 15 | | And, all the while, this gun is a piece of evidence |
| 16 | | in a pending case. |
| 17 | | **Does your department have any policies about trying** |
| 18 | | **to preserve evidence when these cases continue to happen,** |
| 19 | | **or do you just continue to handle the gun and videotape** |
| 20 | | **it regardless of all the, you know, existing** |
| 21 | | **litigation?** |

. . .

| 8 | Q. | **Is there any policy, though, about not -- preserving** |
| 9 | | **evidence and saying, "Wait a minute, we need to get the** |
| 10 | | **other side and get one of their people to do a joint** |
| 11 | | **inspection," for example?** |

. . .

| | | BY MR. BAGNELL: |
| 19 | Q. | I'm just trying to understand.  It sounds like -- I'm not |
| 20 | | arguing, Mr. Larochelle.  I just want to know.  These |
| 21 | | allegations have been made, and there's been lawsuits |
| 22 | | since 2017, regardless of whether you agree with them. |
| 23 | | It sounds to me like your testimony is that the pro shop, |
| 1 | | the custom shop -- |
| 2 | A. | Custom shop. |
| 3 | Q. | The custom shop where you do these inspections, you're |

| | | |
|---|---|---|
| 4 | | not operating under any particular policy that says, |
| 5 | | **"Wait a minute. If there's going to be the possibility** |
| 6 | | **of litigation, we're not going to touch it. We're going** |
| 7 | | **to wait."** |
| 8 | | **Do you have any kind of policy like that?** |
| 9 | | MS. DENNISON: Objection to form and scope. |
| 10 | | You can answer on your individual behalf. |
| 11 | | **THE WITNESS: If there's going to be an issue** |
| 12 | | **with the pistol, counsel lets us know and we leave it** |
| 13 | | **locked in the cage until they say something.** |
| 14 | | BY MR. BAGNELL: |
| 15 | Q. | **So that has happened?** |
| 16 | A. | **Yes.** |
| 17 | Q. | **Do you know why it didn't happen in Ms. Hilton's case?** |
| 18 | A. | **I do not know.** |
| 19 | Q. | Did you reach out to counsel when the gun came in? |
| 20 | A. | No. I don't -- |
| 21 | | MS. DENNISON: Be careful -- |
| 22 | | BY MR. BAGNELL: |
| 23 | Q. | It's not -- I understand. It's not your job duty, |
| 1 | | correct, to start asking questions of legal counsel? |
| 2 | | You're simply -- you're sent a gun and you're told to |
| 3 | | take a look at it, right? |
| 4 | A. | Correct. |
| 5 | Q. | All right. Mr. Shawver said nothing to you -- |
| 6 | | MS. DENNISON: Objection to form. |
| 7 | | BY MR. BAGNELL: |
| 8 | Q. | -- about this? Mr. Jankiewicz? |
| 9 | A. | No. |
| 10 | Q. | Who said they're going to send you the gun? Is that |
| 11 | | Mr. Jankiewicz? |
| 12 | A. | That was Mr. Jankiewicz and Todd Rassa. |
| 13 | Q. | **Todd Rassa. Okay. And, to your recollection, did either** |
| 14 | | **of them say, "Hold it. Keep it in the cage"?** |
| 15 | A. | **No.** |

Ex. 3 to this Motion, Sig 30(b)(6) dep., pp. 15-19.

Sig received the Hilton P320 whereupon it was unilaterally inspected, videotaped and photographed by Sig in the presence of no neutral observers. Sig employee Al Larochelle videotaped part of the inspection including the unboxing of the Hilton P320. He admitted in

11

his deposition that the gun was out of view for extended periods of time during the videotaping:

Q.	The videographer, Mr. Larochelle, what it his name again?

A.	Patrick Hannigan.

Q.	**I ask because the gun is not in view in the video for extended periods of time.  Are you aware that the gun was out of view while he was doing his videos?**

MS. DENNISON:  Objection to form.

THE WITNESS:  **Yeah, after I saw the video, yes**.

Ex.  3, 30(b)(6) dep., p. 22 (emphasis added).

In a still frame of the video of Larochelle taking the gun out of the FedEx box, no scratch or gouge marks are visible on the Hilton gun:



Ex. 4.

12

Rassa emailed Bridge City PD on December 15 that the Hilton P320 had been inspected and showed no problems. A one-page report by Sig of the inspection, authored by Al Larochelle, states that alleged scratch marks and gouges indicate that it "appears" a "foreign object entered the trigger guard" causing the pistol to fire. Ex. 5. He attached several photos of the Hilton P320, one of which shows a clear diagonal scratch mark on the right side of the frame that is not present: (i) in the Bridge City PD photos of the gun at the time of the incident, or (ii) in the still frame of Larochelle's own video as he took the gun out of the FedEx shipping box. Ex. 4.

Hilton's expert Jon Priest took note of this anomaly, stating the "scratch marks" noted by Sig are not apparent in the Bridge City PD photos taken at the scene that day. Ex. 9, p. 11 ("ii. A mark documented to the right-side frame of the Sig Sauer P320 during the Sig Sauer inspection is not observed on the frame of the Sig Sauer P320 when documented by law enforcement after the discharge event"). In his deposition, Assistant Chief Bergeron also expressed surprise at the Sig photos of the Hilton gun:

> Q. Did anything about the report from Sig Sauer surprise you?
>
> A. The photographs were -- there was - - some scratches on the slide did **because I didn't remember seeing any scratches on the slide when I had photographed it [days before]"**

Ex. 6, Bergeron dep., p. 18 (emphasis added).

Officer Hilton herself also observed marks on her gun that were not present before Sig took possession of it after the December 1, 2020 incident:

> Q. And following that is a one-page inspection report dated December 8th, 2020 from Al Larochelle, from Sig Sauer, followed by three photographs. That is the Exhibit 5 package. I'm going to show this to you.
>
> Have you ever seen this before?
>
> A. (Witness peruses document). Yes.

13

Q. When did you see that?

A. Shortly after it was sent to my department when I -- I believe I had returned. Well, I say that. It says it was December 15th. I believe I didn't see it until maybe February when I returned.



Ex. 8.

Q. And did you review the report and the photographs when you received it?

> A. I did.
>
> Q. And what were your thoughts?
>
> A. **I saw scratches on my gun that were not there prior to it being sent to Sig.**
>
> Q. How do you know they were not there prior to being sent to Sig?
>
> A. **My gun was photographed on the desk, and I had reviewed my photographs and I -- of -- see -- saw my gun every day. When I would clean my gun, I never saw scratches or gouges that were described or depicted in those pictures.**

(Ex. 7, Hilton dep. pp. 47-48) (emphasis added).

## **Governing Spoliation Law**

Spoliation of evidence is "among the range of conduct for which a court may assess sanctions using its inherent powers." *Orchestrate HR, Inc.*, 178 F. Supp. 3d at 489. *Avenu Insights & Analytics, LLC v. Kamel*, No. 618CV00422JDKKNM, 2022 WL 16827594, at *4 (E.D. Tex. Oct. 4, 2022), *report and recommendation adopted*, No. 6:18-CV-422-JDK-KNM, 2022 WL 12365980 (E.D. Tex. Oct. 21, 2022)

"A trial court's decision on a motion for sanctions for spoliation of evidence during discovery is reviewed for abuse of discretion. *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 569 (5th Cir.1996). Spoliation of evidence "is the destruction or the significant and meaningful **alteration** of evidence." *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F.Supp.2d 598, 612 (S.D.Tex.2010). We permit an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of "bad faith" or "bad conduct." *Condrey v. SunTrust Bank of Georgia,* 431 F.3d 191, 203 (5th Cir.2005) (internal quotation marks omitted). A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence

15

may be relevant. *Rimkus,* 688 F.Supp.2d at 612. Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence. *See Mathis v. John Morden Buick, Inc.,* 136 F.3d 1153, 1155 (7th Cir.1998)." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)

## Discussion

I. ***Litigation was reasonably foreseeable when Sig took unilateral possession of the Hilton gun in December 2020; therefore, Sig had an obligation not to tamper with it in any way.***

It is unquestionable that the possibility of litigation was foreseeable when Sig took possession of Hilton's P320 in December 2020 days after she claimed it shot her. At least eight individual lawsuits had been brought against it by that time, and each suit involved the same model gun and many resulted in severe injuries. Fn. 4, *supra.* Sig's own 30(b)(6) representative, Al Larochelle, confirmed that Sig was aware of the need to impose litigation holds on certain P320s that were asserted to have fired without a trigger pull (i.e., to put them in "the cage" and not touch them), but it nonetheless unilaterally handled Hilton's P320 - - and fired it - - without her counsel present or any neutral observer. Exs. 3, 5.

As earlier indicated, spoliation is the "destruction or material **alteration of evidence** or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation. Once litigation is reasonably anticipated, a potential party to that litigation must not destroy [or alter] unique, relevant evidence that might be useful to an adversary. This duty arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *In re Correra*, 589 B.R. 76, 133 (Bankr. N.D. Tex. 2018)

(internal punctuation omitted) (emphasis added).[6]

The very first line of the Sig inspection report on the Hilton P320 notes that the gun was sent in after an "accidental discharge." It does not say "negligent discharge." Ex. 5.[7] This fact by itself, and in combination with Sig not following its own policy of placing guns in this situation in "the cage," establishes that Sig had an obligation not to tamper with the Hilton gun no later than December 8, 2020, if not on receiving the first phone call about the incident on December 4, 2020.

II. ***The evidence would allow a rational jury to conclude that scratch marks were imposed on the Hilton gun while in the unilateral possession of Sig Sauer to advance a pretextual claim that a "foreign object" got in the trigger guard and pulled the trigger.***

The photographic and testimonial evidence, including that from Assistant Chief Bergeron, Jon Priest and Hilton herself, is sufficient for a rational jury to conclude that Sig imposed at least one scratch mark if not a gouge on her P320 to further its defense that a "foreign object" somehow got in the trigger guard and pulled the trigger. This was clearly spoliation of key evidence in the case, the gun itself. Sig has been on notice of litigation involving the P320 since at least August 2017 in the *Sheperis v. Sig Sauer* matter in the District of Connecticut. Fn. 4, *supra*. It therefore cannot plausibly claim that it had no notice of its duty to preserve.

---

[6] "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." (quoting *Fujitsu Ltd.,* 247 F.3d at 436)); THE SEDONA PRINCIPLES: SECOND EDITION, BEST PRACTICES RECOMMENDATIONS & PRINCIPLES FOR ADDRESSING ELECTRONIC DOCUMENT PRODUCTION 70 cmt. 14.a (2007) ("[T]he common law duty of preservation arises when a party, either plaintiff or defendant, reasonably anticipates litigation." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010)

[7] As the court is no doubt aware, there is a difference in the firearms world between the term "accidental" discharge of a firearm and a "negligent discharge": "[a]n accidental discharge (AD) occurs when there is a mechanical failure of the firearm. This can include things like firearms that do not have mechanisms to render them drop safe falling a sufficient distance, a firing pin stuck forward, a sear failing, or rounds heating sufficiently to spontaneously ignite in the chamber (as may happen in a closed bolt machine gun).

https://en.wikipedia.org/wiki/Unintentional_discharge#:~:text=An%20accidental%20discharge%20(AD)%20occurs,mechanical%20failure%20of%20the%20firearm.

The evidence not only shows that Sig added at least one scratch mark to the gun, but also fired it 18 times when it should have immediately stored in the "cage." This gratuitous firing of the Hilton P320 destroyed the integrity of the Hilton P320 as it was in its immediate post-accident condition for no valid reason. Bridge City PD had access to many other firearms and Officer Hilton herself was in the hospital at the time. Sig is not some neophyte, small corporation that could credibly claim an innocent mistake in these circumstances. Instead, it is one of the largest arms manufacturers in the world with able counsel and well acquainted with litigation in American courts.

## Conclusion

For the reasons stated, plaintiff requests that her Motion be granted and that a default judgment be entered against defendant Sig for alteration of evidence or, in the alternative, that the jury be instructed that it may draw an adverse inference from Sig's unilateral handling of key evidence in the case and the imposition of scratch marks on the Hilton gun while it its sole possession in December 2020.

.

Respectfully submitted,

Plaintiff Brittany I. Hilton

*/s/Jeffrey S. Bagnell*

―――――――――――――――
Jeffrey S. Bagnell
Federal Bar No. CT18983
Admitted Pro Hac Vice
Jeffrey S. Bagnell, Esq., LLC
55 Post Road West
Westport, CT  06880
(203) 984-8820
jeff@bagnell-law.com

**SICO HOELSCHER HARRIS LLP**
*/s/ James H. Hada*

James H. Hada
Federal Bar No. 11527
3 Riverway, Suite 1910
Houston, Texas 77056
Office:       713.465.9944
Facsimile:    877.521.5576
E-Mail:       jhada@shhlaw.com

**ATTORNEYS FOR PLAINTIFF**

DATED:  MAY 12, 2023

## **CERTIFICATION**

I hereby certify and affirm that on May 12, 2023, the foregoing document was served on all known counsel of record pursuant to the Federal Rules of Civil Procedure using the ECF system.

                                       /s/ *Jeffrey S. Bagnell*
                                    Jeffrey S. Bagnell