IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| BRITTANY I. HILTON, | § | |
| *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO. 1:21-CV-00441-MJT |
| SIG SAUER, INC., | § § | JUDGE MICHAEL J. TRUNCALE |
| *Defendant*. | § § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendant Sig Sauer, Inc.'s Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy Hicks [Dkt. 26], Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani [Dkt. 27], and Motion for Summary Judgment [Dkt. 28]. For the reasons set forth below, the Court grants Sig Sauer's motions.

## I.   BACKGROUND

Plaintiff Brittany Hilton, a Bridge City police officer, claims that she was injured when her department-issued Sig Sauer P320 pistol discharged a round into her upper thigh without its trigger being pulled. Ms. Hilton was carrying the loaded pistol in her purse, along with other loose items, when it discharged. Specifically, the firearm discharged in Ms. Hilton's purse as she walked around her desk in her office, just after she put a bottle of body spray into the purse and looped the purse over her arm. Ms. Hilton subsequently brought this suit against Sig Sauer, the manufacturer of the P320 pistol. Ms. Hilton's live claims are for strict product liability, negligence, and breach of implied warranty of merchantability.[1]

---

[1] In her Original Complaint, Plaintiff alleged additional causes of action for breach of express warranty and violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a). [Dkt. 1 at 36–37]. She stipulated to the dismissal of these claims, with prejudice, however. *See* [Dkts. 8, 9].

## II.  *DAUBERT* MOTIONS

Sig Sauer seeks to exclude the testimony and opinions of Plaintiff's experts, Timothy Hicks and Peter Villani, on the grounds that they are unqualified and that their opinions are unreliable. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. It provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Whether an individual is qualified to testify as an expert is a question of law. *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002) (citing Fed. R. Evid. 104(a)). "District courts must be assured that the proffered [expert] witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* Experts need not be highly qualified to satisfy Rule 702 though. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* But the "witness's qualifying training or experience, and resultant specialized knowledge" must be "sufficiently related to the issues and evidence before the trier of fact." *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013)

(quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.04(1)(b) (Joseph M. McLaughlin ed., 2d. 1997)).

In *Daubert*, the Supreme Court outlined four non-exclusive factors for courts to use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). When evaluating a *Daubert* challenge, a court's focus "must be solely on [the expert's] principles and methodology, not on the conclusions that they generate." *Id.* at 595.

While *Daubert* provides a "flexible inquiry" rather than a "definitive checklist," *id.* at 593, 595, it requires that "an expert bears the burden of furnishing some objective, independent validation of his methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (internal quotation marks omitted). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007); *see also Brown*, 705 F.3d at 536 ("The expert's assurances that he has utilized generally accepted principles is insufficient.").

### A. Timothy Hicks

Timothy Hicks is a mechanical engineer who spent most of his career in the automotive industry. [Dkt. 26-5]. While Hicks has never manufactured a firearm or a component of a firearm, he testified that his automotive experience required similar processes and approaches. [Dkt. 26-6 at 23:10–17]. He is not a gunsmith, nor has he ever taken any gunsmith courses or been employed by a company that manufactures firearms. *Id.* at 23:22–23:4. He also has never published anything

3

on the manufacture or design of a firearm. *Id.* at 24:5–10. Hicks has never seen a firearm assembled from an initial production standpoint, or manufactured. *Id.* at 25:8–13. And before his involvement with similar P320 cases in 2022, he had never looked at drawings or internal components of a pistol similar to the P320. *Id.* at 24:11–19.

Hicks' opinion is that if two conditions occurred, then Plaintiff's gun could have discharged without a trigger pull: (1) the striker had to have become disconnected from the sear; and (2) the safety lock had to have failed. [Dkt. 26-6 at 26:6–20]. This theory requires that "there has to be some type of motion or inertia or vibration to the to the firearm to make it discharge." *Id.* at 28:14–29:2. But he could not answer how much inertia or vibration would be required, *id.* at 29:3–10; whether the vibration or inertia caused disengagement immediately or incrementally over time, *id.* at 29:16–20; or whether firing the gun would reset it, thus requiring additional force to move the parts out of place again. *Id.* at 30:3–12.

Hicks ultimately concluded, "[b]ased on [his] investigation and the work conducted to date . . . [that] the physical evidence . . . supports Detective Hilton's description of the circumstances of this incident" and that her P320 "was defective and unsafe for use." [Dkt. 26-4 at 20]. Specifically, that "normal and expected movement and vibration while holstered caused an uncommanded discharge with a combination of some or all of the defective conditions" described in his report, including:

1) Surface quality (no secondary processing) and misalignment of interfacing sear step and striker foot. With both of these parts being out of specification, the striker became disconnected from the sear without the trigger being pulled.

2) Surface quality, rounded surfaces, and misalignment of the face of the safety lock tab and the vertical stop face on the striker body, such that both of these areas failed to prohibit the striker from moving forward during the subject event.

4

3) Axial variation and gaps between the striker pin and striker housing with slide movement causes misalignment of the safety lock tab to the striker pin body, and the striker foot lateral position to the sear step face. This occurs after each round is fired and can affect the orientation of the two components each time.

4) Ability of the slide (and therefore the striker assembly) to move vertically and laterally relative to the sear reducing the interfacing surface contact area even further, which will cause the striker foot to become disengaged from the sear face. This relative movement occurs while properly holstered from normal body movement and usage of the firearm.

5) The striker foot is unable to engage completely on the surface of the sear step due to the changes in the upgraded design, manufacturing processes and lack of secondary machining, and fit-up and variation issues between the parts discussed in this report.

6) The removal of the safety lever return spring by Sig Sauer allows the lever to rotate out of position when the pistol is carried in a muzzle down orientation, which can also contribute to the safety lock to be out of position. When this issue is combined with the axial variation described in item 3 above and the part quality issues, it allows the striker to move forward completely when it becomes disengaged from the sear. The safety lock only has to be out of position or out of tolerance by the thickness of the stamping which is 0.9 mm.

[26-4 at 20]. He testifies that each of these alleged defects *could have* contributed to Plaintiff's P320 firing without trigger pull but he cannot say which ones specifically caused the firearm to discharge. *Id.* at 31:1–21. When questioned about his conclusions, he repeatedly conceded that he did not have any testing or analysis to show that the alleged defects would cause the effects he reported. [Dkt. 26-6 at 11:4–11; 11:21–12:2; 13:16–24; 17:12–18:4; 27:14–18; 28:6–12; 29:3–10; 31:24–32:9].

**B. Peter Villani**

Peter Villani is a former police officer currently employed as an operations officer for the United States Department of Veteran Affairs Police. [Dkt. 27-6 at 2]. He has participated in shooting competitions, worked as a range manager and firearms salesman, and taught tactical awareness and proper use of issued sidearms. *Id.* at 3–4. He has also been certified as an armorer for multiple firearms (including the Sig Sauer P320), and as a firearms instructor, pistol safety

5

instructor, and range safety officer. *Id.* Villani is not an engineer, nor has he ever been involved with the design or manufacture of firearms or firearm components. [Dkt. 27-7 at 10:22–11:17]. Prior to his involvement in similar P320 cases, Villani had never reviewed design schematics for any firearm. *Id.* at 11:18–21. Beyond "test firing" pistols, Villani has never done any type of firearms testing to any recognized or written standard. *Id.* at 13:14–7. He testified in a similar P320 case that he has not even read any recognized firearm testing standards. [Dkt. 27-8 at 6:14–7:2]. He also has never published any article or other publication, or given any presentation, related to firearm design or manufacture. [Dkt. 27-7 at 13:18–24]. Villani also testified that he did not rely on any publications or studies to reach his opinions. [Dkt. 27-7 at 5:2–9].

While some of Villani's work has involved dissembling and repairing guns that were not working properly, it was limited to cleaning the firearms and simple repairs like replacing broken springs. *Id.* at 16:20–19:16. He is not a gunsmith, nor has he ever taken any gunsmithing courses. *Id.* at 14:2–6. When questioned about his conclusions, he repeatedly conceded that he did not have any testing or analysis to show that the alleged defects would cause the effects he reported. *Id.* at 25:21–24; 26:10–12; 27:3–7; 30:23–31:3. Many of Villani's opinions relate to "excess material" in the gun; however, he testified that he has not measured or quantified the amount of excess material on any of those four components, nor does he have the equipment to. *Id.* at 30:4–13. Instead, he believes that he suggested to Hicks that if Hicks could measure the excess material, he should try to. *Id.* at 30:14–17. Villani's report provides: "Depending upon the condition of the individual [P320] components' status (sear/striker engagement, excess molding material, misalignment of safety lock tab, wear, etc.), any combination of these reported defect could lead to an uncommanded discharge minus a trigger pull." [Dkt. 27-5 at 12]. But he testified that other than the excess material and the "ramp" he does not know which of the factors that he identified

6

were present when Plaintiff's gun discharged. [Dkt. 27-7 at 32:13–21]. He also testified that if something in her purse caused the trigger to be pulled, then the "defects would be of no consequence." *Id.* at 33:5–14. Villani did not undertake any analysis of what was in her purse that may have been able to pull the trigger, however. *Id.* at 33:17–20. Indeed, other than a surgical mask, Villani does not know what items were in her purse when the gun discharged. *Id.* at 8:6–9.

Villani contends in his report that when he "began [his] examination and photography of the firearm's internal parts" he noticed several "manufacturing defects." [Dkt. 27-5]. He then recounts these supposed defects and their effects:

1) "The safety lock tabs positive contact surface is deformed and does not match Sig Sauer[']s drawings . . . which depicts the tab to be rectangular with squared off edges. The safety lock tab presented, showed an oval type shape with raised edges which appeared to be excess material from the stamping process that was not removed prior to the parts installation into the striker assembly. This raised perimeter prevents the positive contact surface from making proper contact with the striker stop (wall) of the striker should the striker fail from an uncommanded discharge." *Id.* at 5.

2) "There is also a raised higher edge along the bottom horizontal portion of the tab which is slightly higher in appearance than the rest of the raised edging. This portion of the tab rides along the horizontal plane of the striker body as the striker travels forward during an uncommanded discharge. Normally, the safety lock tab would be raised over the striker's horizontal plane as the safety lever located in the fire control unit (FCU), would raise it during an intentional trigger press. . . . Unlike Sig Sauers official drawings, this part, again, does not match what was installed in the firearm." *Id.*

3) "[T]he striker foot [has] excess molding material around the entire perimeter of the striker foot's positive contact surface which prevents 'positive' contact with the sear face. When actually engaged with the sear[']s 'positive contact surface', the only portion of the striker foot that makes physical contact with the sear is the lower raised portion of the excess molding material which reduces the overall contact between the two parts. Since both the sear and striker foot show excess molding material along the perimeter of both parts of their 'positive contact' areas, it is unlikely that there was ever positive contact as designed between the two parts which can contribute to an uncommanded discharge." *Id.* at 6.

7

4) "Also, the top portion of the sear face . . . also shows a deformity as the top horizontal edge of the sear is not straight and also shows excess molding material along its horizontal edge. The sear also shows signs of physical offset of the striker foot to the left of the sear due to the striker not being vertically centered to the sear as there is a discoloration caused by discharge blowby during recoil. This offset has been observed in previous P-320's that I have examined. Also not having the striker foot vertically centered to the sear causes the sear springs to be unevenly compressed causing the sear to be at an angle to the striker foot allowing it to walk off easier." *Id.* at 7.

5) "[A] small piece of slivered brass . . . was caught in the inner bottom corner of the stop. This piece of brass could interfere with the operation of the safety lock tab as it is in between the safety lock tab and striker stop." *Id.* at 8. "[T]he brass obstruction could move, preventing the safety lock tab from properly engaging the striker stop and contributing to an uncommanded discharge if the striker foot had slipped off of the sear face." *Id.* at 9.

6) "[A] 'ramping' transition from an angled portion of the horizontal striker body on the right side to a straight portion of the horizontal striker body which can also cause the safety lock tab to 'jump' up and over the striker stop during an uncommanded discharge. This angled ramp along with the foreign obstruction (brass) can contribute to the safety lock tab failure." *Id.* at 10.

**C. Neither expert's testimony is reliable.**

While the Court has doubts about both experts' relevant qualifications, it need not decide whether they are qualified. Even if the experts are qualified, their testimonies are not reliable, and therefore are not admissible. Indeed, this is the same decision reached by most of the courts that have considered their testimonies in similar cases.[2] *See Mayes v. Sig Sauer, Inc.*, No. 1:19-CV-00146-GNS-HBB, 2023 WL 2730264, at *7 (W.D. Ky. Mar. 30, 2023) (addressing and excluding Hicks and Villani); *Frankenberry v. Sig Sauer, Inc.*, 4:19-CV-02990-JD, [Dkt. 79 at 10] (D.S.C. Feb. 4, 2022) (addressing and excluding Villani); *Jinn v. Sig Sauer, Inc.*, No., 1:20-CV-01122-

---

[2] Only one court has ruled otherwise. *See Guay v. Sig Sauer, Inc.*, 610 F. Supp. 3d 423 (D.N.H. 2022). The *Guay* court admitted Hicks' testimony entirely, *id.* at 433, but concluded that Villani was only qualified to testify to some of his opinions. *Id.* at 429–32. Other than opining that testing is not necessary, the *Guay* court did not address the *Daubert* reliability factors, however. A jury in *Guay* ultimately returned a verdict in favor of Sig Sauer. *Guay v. Sig Sauer, Inc.*, No. 1:20-cv-00736-LM, [Dkt. 109], (D.N.H. Sept. 9, 2022).

PGG-RWL, *Report and Recommendation of Magistrate Judge* [Dkt. 75 at 17, 33] (S.D.N.Y. Apr. 12, 2023) (addressing and recommending excluding Hicks and Villani).[3] Because Plaintiff makes essentially the same reliability arguments for both experts in response to Sig Sauer's motions, the Court analyzes the experts together.

Not a single *Daubert* reliability factor favors admitting Hicks' or Villani's testimony. As previously discussed, neither expert has completed *any* testing to prove that the alleged defects could cause the pistol to fire without a trigger pull. As to Villani, Plaintiff attempts to discredit this deficiency by disingenuously claiming that "Villani testified that the failure has been replicated in real life many times." [Dkt. 38 at 28]. Her claim references Villani's testimony regarding *one* separate incident where a P320 allegedly discharged without a trigger pull. After watching the video, Villani supposedly testified that he "[had] no question that [the individual depicted] did not pull the trigger. His finger was off of the trigger, and the gun was in his holster." *Id.* at 29.[4] As to Hicks, Plaintiff similarly argues that "[c]ommon sense" prohibits requiring an expert "to risk his or her life to replicate an event that has already been replicated in real life many times over the last six years." [Dkt. 38 at 21]. Plaintiff then recounts several allegations of unintended discharges in lieu of Hicks completing his own testing. [Dkt. 38 at 21–24]. Plaintiff's argument seems to be that a functioning gun does not discharge without a trigger pull, and because numerous P320s have allegedly discharged without a trigger pull, her experts must be right that her gun is defective. This argument neglects that the Court's focus is the experts' methodologies, not their conclusions. *See Daubert*, 509 U.S. 595. "To be sure, it is not required that the experts conduct a litany of tests on

---

[3] As of the date of this Order, the United States District Judge presiding over *Jinn v. Sig Sauer, Inc.* in the Southern District of New York has not entered an order adopting or rejecting the abovementioned Report and Recommendation of Magistrate Judge.

[4] The Court could not locate this testimony in the exhibit that Plaintiff cited. *See* [Dkt. 38-17].

9

[Plaintiff's] specific pistol, but rather, they must demonstrate that their theories have some empirical evidence to support the assertion that the alleged defects have been found to cause uncommanded discharges." *Mayes*, 2023 WL 2730264, at *8.

Second, the experts' theories have not been subjected to peer review or publication. Both experts testified that they have not published any work involving firearm manufacture or design, nor did they rely on any publications to reach their respective opinions. Plaintiff argues that "[t]here is no peer reviewed literature on the P320's defect as it is a relatively new design." [Dkt. 38 at 29]. As with the testing, a publication need not be on the P320 specifically to demonstrate that the experts' theories are supported by some empirical evidence. *See Mayes*, 2023 WL 2730264, at *8. The experts do not even point to any literature to demonstrate that their opinions are based on new applications of existing theories. To the Court's knowledge, Hicks' and Villani's opinions are based on wholly novel theories that they expect the Court to simply take their word for.

Third, neither expert identifies a known error rate for their respective methodology. And finally—as already alluded to in analyzing the previous factors—they have not demonstrated that there is a general acceptance of their respective theories in the engineering community. Plaintiff contends that their conclusions that the pistol can fire without a trigger pull "is not a novel or unreliable opinion given that Sig Sauer's own August 4, 2017 press release on the P320 stated that vibration could make the original gun's safety mechanism fail." [Dkt. 38 at 4] (citing [Dkt. 38-5 at 1]). The press release she references provides:

> All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

10

[Dkt. 38-5 at 1]. Plaintiff again neglects, however, that when evaluating a *Daubert* challenge, a court's focus "must be solely on [the expert's] principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. This generic disclaimer does not provide an objective, independent validation of the experts' methodologies. *See Brown*, 705 F.3d at 536.

Even though none of the *Daubert* factors favors admitting the experts' testimonies, Plaintiff instructs the Court: "So long as an expert's scientific testimony rests on 'good grounds based on what is known' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." [Dkt. 38 at 29] (quoting *Daubert*, 509 U.S. at 590) (internal citations omitted). But while Plaintiff asserts that their testimony "rests on good grounds based on what is known," the only basis she provides for that assertion is their subjective opinions. Additionally, the Court held a hearing on Sig Sauer's *Daubert* motions, but Plaintiff did not have Villani or Hicks attend. [Dkt. 48]. Therefore, Plaintiff forfeited the opportunity to have her experts potentially remediate these deficiencies. The Court must exclude expert testimony that is not reliable. *See* Fed. R. Evid. 702. Because the Court is not aware of any objective, independent validation of the methodologies used by Timothy Hicks or Peter Villani, it must grant Sig Sauer's motions to exclude their testimonies and opinions. [Dkts. 26, 27]

### III.     MOTION FOR SUMMARY JUDGMENT

In its Motion Summary Judgment, Sig Sauer contends that if the Court excludes Hicks' and Villani's testimonies, it should also dismiss Plaintiff's case because she cannot proceed on any of her claims without expert testimony. [Dkt. 28 at 2]. The Court agrees.

## A. Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted); Fed. R. Civ. P. 56(c). An issue is material if its resolution could affect the outcome of the action. *DIRECTV*, 420 F.3d at 536. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All reasonable inferences must be drawn in favor of the nonmoving party. *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002). There is no genuine issue of material fact if, when the evidence is viewed in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (citations omitted).

Where the dispositive issue is one which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating that there is no evidence in the record to establish an essential element of the nonmovant's claim. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (internal citations omitted).

If, under the first option, the nonmoving party cannot point to evidence sufficient to dispute the movant's contention that there are no disputed facts, the moving party is entitled to summary judgment as a matter of law. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Under the second option, the nonmoving party may defeat the motion by pointing to "supporting evidence already in the

12

record that was overlooked or ignored by the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332–33 (1986) (Brennan, J., dissenting). "Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Duffy v. Leading Edge Prods.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the nonmoving party can meet its burden under either of these scenarios, the burden shifts back to the movant to demonstrate the nonmovant's inadequacies. *Id.* If the movant meets this burden, "the burden of production shifts [back] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Celotex*, 477 U.S. at 333 n.3. "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial." *Parekh v. Argonautica Shipping Invests. B.V.*, No. CV 16-13731, 2018 WL 295498, at *3 (E.D. La. Jan. 4, 2018) (quoting *Celotex*, 477 U.S. at 333 n.3).

**B. Discussion**

"In Texas, a plaintiff can predicate a products liability action on one or more of at least three theories of recovery: (1) strict liability under [Restatement (Second) of Torts] § 402A, (2) breach of warranty under the U.C.C., and (3) negligence." *Syrie v. Knoll Intern.*, 748 F.2d 304, 306 (5th Cir. 1984); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.001(2) (defining "products liability action" as "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach

13

of express or implied warranty, or any other theory or combination of theories"). Here, Plaintiff seeks to recover under all three theories.

To prevail on a strict products liability action, a plaintiff must establish that: "(1) a product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user." *Syrie*, 748 F.2d at 306. "A product may be proven to be defective if it is unreasonably dangerous in construction, or it is unreasonably dangerous as designed, or it is unreasonably dangerous because adequate warnings or instructions are not provided." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 376 (Tex. 1984).

For a products liability claim premised on negligence, a plaintiff must demonstrate: "(1) that the manufacturer owed a duty to the plaintiff; (2) that the manufacturer breached that duty; (3) that the plaintiff was injured; and (4) that the manufacturer's breach of the duty was the proximate cause of the plaintiff's injury or damages." *McLennan v. Am. Eurocopter Corp., Inc.*, 245 F.3d 403, 431 (5th Cir. 2001). A strict liability claim "focuses upon the product itself, and requires a showing that the manufacturer placed a product into the stream of commerce that was unreasonably dangerous for a foreseeable use," while a negligence claim "focuses upon the conduct of the manufacturer in placing that product into the stream of commerce, and requires a determination of whether that conduct complies with the applicable standard of care." *Id.*

"[A]lthough a negligence claim requires a different showing from a strict liability claim, a manufacturer logically cannot be held liable for failing to exercise ordinary care when producing a product that is not defective." *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257 (5th Cir. 1988). This is because: "(1) if a product is not unreasonably dangerous because of the way it was manufactured, it was not negligent to manufacture it that way and (2) even if the

14

manufacturer was somehow negligent in the design or production of the product, that negligence cannot have caused the plaintiff's injury because the negligence did not render the product 'unreasonably dangerous.'" *Id.* Accordingly, if Plaintiff's strict liability claim fails because she cannot establish that the firearm was defective, then her negligence claims necessarily fail too.[5]

Similarly, if a plaintiff's strict liability claim must be dismissed, so too must their implied warranty of merchantability claim, when the two claims are premised on the same alleged defect. *Smith v. Chrysler Grp., L.L.C.*, 909 F.3d 744, 752 (5th Cir. 2018) (citing *Hyundai Motor Co. v. Rodriquez ex rel. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999)). "[A] seller of goods impliedly warrants that they 'are fit for the ordinary purposes for which such goods are used.'" *Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998) (quoting Tex. Bus. & Com. Code Ann. § 2.314(b)(3)). "For goods to breach this warranty, they must be defective—that is, they must be 'unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy.'" *Id.* (quoting *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 443–444 (Tex. 1989)). Indeed, this a different definition of "defective" than is used for a strict products liability claim, which focuses on whether a product is "unusually dangerous." *See Lucas*, 696 S.W.2d at 376. Thus, a product may breach the implied warranty of merchantability without giving rise to a strict liability claim if it is unfit for its ordinary purpose but is not unusually dangerous. But where, as here, the breach of the implied warranty claim is premised on the same defect as the strict liability claim, the failure to establish a defect for purposes of the strict liability claim also kills the implied warranty claim.

---

[5] Plaintiff alleges that Sig Sauer was negligent in designing and manufacturing the firearm, as well as in "failing to unambiguously warn purchasers and end users of the gun . . . of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture." [Dkt. 1 at 32]. While some negligent failure to warn claims may not be encompassed by a strict products liability claim, *see Garrett*, 850 F.2d at 257 & n.8, that is not the case here. Plaintiff's negligent failure to warn claim is premised on the firearm discharging without a trigger pull because of a defect. Therefore, if she fails to prove that defect, the failure to warn claim fails.

The Court therefore first addresses whether Plaintiff can prevail on her strict liability claim. If she cannot establish that a defect caused the gun to discharge without a trigger pull, the Court need not engage in a negligence or breach of implied warranty of merchantability analysis.

"Expert testimony is required when an issue involves matters beyond jurors' common understanding." *Mack Trucks, Inc. v, Tamez*, 206 S.W.3d 572, 583 (Tex. 2006). "Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition." *Id.* In defective products cases, the Supreme Court of Texas has "consistently required competent expert testimony and objective proof that a defect caused the condition complained." *Id.* (citing *Nissan Motors Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) (holding that "[a] lay juror's general experience and common knowledge do not extend to whether design defects such as those alleged in this case caused releases of diesel fuel during a rollover accident"); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42–43 (Tex. 2007) ("If juries were generally free to infer a product defect and injury causation from an accident or product failure alone, without any proof of the specific deviation from design that caused the accident, expert testimony would hardly seem essential. Yet we have repeatedly said otherwise.").

Determining whether a defect in Plaintiff's P320 enabled it to discharge without a trigger pull, thereby causing her injuries, requires technical knowledge beyond jurors' general experience and common understanding. *See Mack Trucks*, 206 S.W.3d at 583. Therefore, expert testimony on causation is required to show that Plaintiff is entitled to recover under any of the products liability theories.

Plaintiff's response to Sig Sauer's Motion for Summary Judgment directs the Court's attention to other similar incidents involving P320s that allegedly discharged without trigger pulls. These other incidents cannot establish that a defect caused her gun to discharge, however. Analogous cases involving cars that allegedly accelerated without the driver pressing the gas pedal demonstrate why. *See, e.g.*, *Nissan Motors Co. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004). "In all of these cases, it was not enough that a vehicle accelerated when claimants swore they had done nothing. Instead, [the Supreme Court of Texas] [has] consistently required competent expert testimony and objective proof that a defect caused the acceleration." *Id.* (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 715, 717, 719 (Tex. 1998); *Gen. Motors Corp. v. Hopkins*, 548 S.W.2d 344, 346–47 (Tex. 1977), *overruled on other grounds by Turner v. Gen. Motors Corp.*, 584 S.W.2d 844 (Tex. 1979) *and Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984); *Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 88–89, 93–94 (Tex. 1974), *overruled on other grounds by Duncan*, 665 S.W.2d 414).

In *Nissan Motors*, the Supreme Court of Texas reversed a jury verdict that found that a defect caused the plaintiff's car to unintentionally accelerate. 145 S.W.3d at 134. To prove that her car had a defect, the plaintiff's case at trial centered on the quantity of other alleged incidents of unintended accelerations. *Id.* at 144–48. The trial court erred by allowing such evidence because "[p]roof of unintended acceleration is *not* proof of a defect." *Id.* at 148. And "proof of *many* instances of unintended acceleration cannot prove a defect either; a lot of no evidence is still no evidence." *Id.* "[P]roduct defects must be proved; they cannot simply be inferred from a large number of complaints. If the rule were otherwise, product claims would become a self-fulfilling prophecy—the more that are made, the more likely all must be true." *Id.* at 142. While the court acknowledged that other similar incidents may be admissible for certain purposes, it concluded:

17

> [W]e have never held that mere claims of previous accidents can prove a product is defective, and we decline to do so here. A number of complaints may require a prudent manufacturer to investigate, and may presage liability if those complaints are substantiated and the manufacturer does nothing. But a large number of complaints cannot alone raise a fact question that a defect exists.

*Id.* at 140.

Likewise, here, proof of an unintended discharge is not proof of a defect. Nor is proof of many unintended discharges. Under Texas law, no reasonable jury could conclude that a defect caused Plaintiff's gun to discharge without a trigger pull solely from (1) lay testimony that her gun discharged without a trigger pull and (2) the existence of other similar alleged incidents. Qualified and reliable expert testimony on causation is necessary. With Hicks and Villani excluded from testifying, Plaintiff has failed to raise a fact question that a defect exists.[6] Because Plaintiff's claims are all predicated on this same defect, Sig Sauer is entitled to summary judgment on all of Plaintiff's claims. *See Garrett*, 850 F.2d at 257; *Smith*, 909 F.3d at 752.

## IV.   CONCLUSION

It is therefore **ORDERED** that Defendant Sig Sauer, Inc.'s Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy Hicks [Dkt. 26], Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani [Dkt. 27], and Motion for Summary Judgment [Dkt. 28] are **GRANTED**.

---

[6] Plaintiff points out in her response to Sig Sauer's Motion for Summary Judgment that she designated a third expert, Jonathyn Priest, and that Sig Sauer did not move to exclude his testimony. [Dkt. 35 at 1 n.1]. Priest's expert report does not address or identify any defects that caused or could have caused Plaintiff's gun to discharge without a trigger pull, however. *See generally* [Dkt. 35-1]. Therefore, his report does not cure this deficiency in Plaintiff's proffered evidence.

It is further **ORDERED** that Plaintiff Brittany Hilton's claims are **DISMISSED WITH PREJUDICE**. The Court will enter a Final Judgment in accordance with this Order.

**SIGNED this 8th day of June, 2023.**

Michael J. Truncale
United States District Judge