UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| BRITTANY I. HILTON | § § § | |
| *Plaintiff*, | § | |
| | § | C.A. No. 1:21-cv-00441 |
| v. | § | |
| | § | JUDGE MICHAEL J. TRUNCALE |
| SIG SAUGER, INC. | § | |
| | § | |
| *Defendant.* | § | JURY DEMANDED |

**PLAINTIFF HILTON'S MOTION FOR RECONSIDERATION OF ORDER TO EXCLUDE EXPERTS AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Brittany I. Hilton ("Hilton") respectfully moves for reconsideration of the Court's June 8, 2023 Memorandum Opinion and Order [Dkt. 65] (hereinfafter "Order" and/or Dkt. 65) granting Defendant Sig Sauer, Inc.'s ("Sig Sauer") motions for summary judgment and to exclude two of plaintiff's three experts.

**I.    SUMMARY**

Reconsideration is warranted because this Honorable Court (i) erroneously applied *Daubert*, (ii) erroneously dismissed the entirety of Hilton's 175 OSI's that are evidence of defect, and (iii) improperly drew many inferences in favor of Sig Sauer in violation of Fed. R. Civ. P. 56. An example is the Court unilaterally recasting Sig Sauer's own admission of a defect allowing the P320 to fire without a trigger pull as a "generic disclaimer." Order, p. 11. That document is not a boilerplate disclaimer, as one might find in a user manual; it is an affirmative admission, in a press release, of a defect based on Sig Sauer's own first-hand knowledge of "recent events." Ex. 1.

Vacatur of the Order is appropriate because it rests solely on the improper exclusion of two of Hilton's three expert witnesses; dismisses all OSI's when they are

evidence of defect involving the exact same gun and product defect; and draws factual inferences in favor of movant Sig Sauer.

Testing or laboratory replication of a defect is not required under *Daubert* but is merely one factor to be considered. Regardless, Sig Sauer's *own October 2021 testing* corroborated Hicks and Villani's theories that there are internal defects in the P320 that can allow it to fire without a trigger pull, and that Hilton's did fire without a trigger pull. There was therefore no need to do additional, cost-prohibitive testing.[1]

Further, the Court discounted in a footnote the entire report of Hilton's third expert, Jonathyn Priest, who concluded to a reasonable degree of certainty that Hilton's P320 fired without a trigger pull inside her handbag, and that scratch marks were imposed on the trigger area after Sig Sauer took possession of the P320. It is well within a jury's competence and collective common sense to determine whether a bottle of body spray, a miniature stuffed animal (also present in her handbag), or a phone charging cord, could somehow pull the trigger of a holstered gun with five pounds of trigger weight - - even without all the expert testimony that Hilton has offered. A jury should also be allowed to weigh the convincing evidence that Sig Sauer spoliated Hilton's weapon to concoct some explanation for how her holstered gun fired without a trigger pull.

Finally, Hilton's counsel complied with the Court's *Daubert* hearing Order. In response to inquiry over who should be present and whether in person or via Zoom during the ongoing Covid emergency, the clerk instructed that "attorneys" needed attend in person and that no Zoom calls would be permitted.

II.       **GOVERNING LAW REGARDING MOTIONS FOR RECONSIDERATION**

---

[1] *Isa v. Acad., Ltd.,* No. 4:16-CV-2041, 2018 WL 8732187, at *4 (S.D. Tex. Mar. 5, 2018) ("*Daubert* imposes no requirement for repeated testing").

The Court's Order excluded Hilton's two expert witnesses, Timothy Hicks and Peter Villani. In the Order, the Court did not decide on the experts' relevant qualifications and instead excluded the experts' evidence and opinions after finding that "their testimonies are not reliable and, therefore, are not admissible." Doc. #65 at 8. The Court then granted Sig Sauer's Motion for Summary Judgment because "qualified and reliable expert testimony on causation is necessary" in a case such as this. *Id*. at 18.

Though the Federal Rules of Civil Procedure do not describe motions for reconsideration, the Fifth Circuit Court of Appeals treats motions for reconsideration as "motions to alter or amend judgment pursuant to Rule 59(e). . . if [they are] served within ten days of the court's ruling." *Crostley v. Lamar Cnty., Texas*, 2014 WL 12613274, at *2 (E.D. Tex. Oct. 7, 2014); *see also Bass v. U.S. Dep't of Agric.*, 211 F.3d 959, 962 (5th Cir. 2000). Under the Rule 59(e) standard, a court may reconsider its ruling "when there has been: (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or prevent manifest injustice." *Blue Spike, LLC v. Juniper Networks, Inc.*, 2018 WL 4261316, at *1 (E.D. Tex. May 16, 2018).

The Court should reconsider its decision to exclude Hilton's expert witnesses as a clear error of law and to prevent manifest injustice to Detective Hilton, who has a right to a jury trial under the Seventh Amendment.

### III. DISCUSSION

The Court's Order excluding Hilton's expert witnesses and granting Sig Sauer's Motion for Summary Judgment is based on clear errors in the Court's interpretation and application of the law.

First, the Court treats testing replication of the defect as a requirement for expert

3

reliability under *Daubert* when it is not.[2]  Regardless, Sig Sauer's own testing, which Hilton is permitted to present in her case in chief, corroborates evidence of defect and her experts' methods and conclusions.  Second, the Court fails to consider *any* of Hilton's 175 OSIs as evidence of defect contrary to the very *Nissan Motors* decision it cites.  Finally, the Court draws many factual inferences in favor of movant Sig Sauer in violation of Fed. R. Civ. P. 59.  *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150 (2000) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986)).

A. **REPEATED TESTING OF THE DEFECT AT ISSUE IS NOT REQUIRED UNDER *DAUBERT* WHEN IT IS COST PROHIBITIVE; REGARDLESS, SIG SAUER'S OWN OCTOBER 2021 TESTING CORROBORATES HICKS' AND VILLANI'S THEORIES AND METHODOLOGIES**

In its Order, the Court states that "neither expert has completed any testing to prove that the alleged defects could cause the pistol to fire without a trigger pull."  Order, p. 9.  It then notes "[t]o be sure, it is not required that the experts conduct a litany of tests on [Plaintiff's] specific pistol, but rather, they must demonstrate that their theories have some empirical evidence to support the assertion that the alleged defects have been found to cause uncommanded discharges."  Order, pp. 9-10, *citing Mayes v. Sig Sauer, Inc.*, No. 1:19cv00146, 2023 WL 2730265 at *8.  The Magistrate Judge in *Jinn v. Sig Sauer, Inc.* similarly noted "to be sure, testing is not an absolute."  No. 1:20CV01122, Report and Recommendation of Magistrate Judge, [Dkt. 75 at 24] (SDNY April 12, 2023).

But testing *ha*s been conducted in this case - - by Sig Sauer, and it shows that

---

[2]   A trial judge determining the admissibility of an engineering expert's testimony "*may* consider one or more of the specific *Daubert* factors. The emphasis on the word "may" reflects *Daubert's* description of the Rule 702 inquiry as "a flexible one." The *Daubert* factors do *not* constitute a definitive checklist or test, and the gatekeeping inquiry must be tied to the particular facts." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999) (internal citations omitted) (emphasis in original).

inertial forces applied to 10 P320's (each handpicked by Sig Sauer) resulted in two sear displacements and a trigger pin being displaced after approximately one hour of vibration and loose cargo tests. Ex. 2, Hicks report, pp. 15-16.[3] Hilton's experts were entitled to rely on that testing (Hicks' report expressly cites it) without incurring the astronomical expense to Hilton of additional testing. *Isa,* No. 4:16-CV-2041, 2018 WL 8732187, at *4 (S.D. Tex. Mar. 5, 2018) ("*Daubert* imposes no requirement for repeated for repeated testing"); *Garcia v. BRK Brands, Inc.*, 266 F. Supp. 2d 566, 574 (S.D. Tex. 2003) ("…a single test might constitute "sufficient facts or data" under Rule 702 where repeated tests are unavailable or impracticable because of prohibitive expense or other reasons…"); *Hankins v. Ford Motor Co.*, No. 3:08-CV-639-CWR-FKB, 2011 WL 6046304, at *4 (S.D. Miss. Dec. 5, 2011) (court explains how an expert in an automobile defect case may rely on industry knowledge and testing as well as 3rd party (NHTSA) tests and credits the expert's ***detailed inspection*** of the defective car and comparisons to functional examples in light of the expert's "extensive experience," including experience with the exact same car and model in prior cases) (emphasis added).

Even if the Court were to require additional testing despite this authority, Sig Sauer's general counsel recently stated that there are "2.3 million" P320s in circulation in the United States and elsewhere. Ex. 3, p. 3. The question then becomes what an adequate sample size is to carry out realistic testing in a laboratory setting. *See, e.g., Winebarger v. Bos. Sci. Corp.,* No. 2:13-CV-28892, 2015 WL 1887222, at *24 (S.D.W. Va. Apr. 24, 2015) ("[f]urthermore, Dr. Dunn's testing lacks sufficient indicia of reliability because he failed to follow a written protocol or utilize a *sufficiently large sample size*); *see also Daubert*, 509 U.S. at 594 (stating "the court ordinarily should consider the known or potential rate of

---

[3] Sig Sauer advised its testing contractor that the anticipated malfunction was "[l]oosening of components, ***Potential sear disengagement***, wear, etc." *Id.*

5

error"). And the question is asked in the context of Sig's own testimony that it "does not even know" how such testing would be carried out:

> Q. Do you do any testing for accidental discharges?
>
> MR. GIBSON:· Object to form.
>
> **A. I'm not sure how that type of testing would even be performed, to be honest with you.**

Ex., pp. 114-115, Sean Toner, designer of P320, testimony).

Even a relatively small sample size of 1,000 P320s would alone cost approximately $700,000 at roughly $700 per unit. If 500, approximately $350,000. But even putting that cost aside and whether 1,000 or 500 P320s constitute a "sufficiently large sample size," realistic testing of the P320 would necessarily involve the use of robots walking on treadmills for extensive periods of time with holstered P320s. How robotic holstering and un-holstering before and after walking would even be accomplished is simply not known. But that is the only way realistic testing of realistic carrying conditions could be carried out, and the technology required would push the total cost of testing well into the upper six figures if not higher.

Certainly, a sample size of 10 brand new and unused P320's, hand-picked by Sig Sauer, and tested privately in October 2021 during ongoing litigation, with no involvement of any neutral observer or realistic carrying conditions, is inadequate in the face of 2.3 million now in commerce after seven years. But as noted, even that private testing resulted in a 20% failure rate with the report noting that the sear was "out of battery" after the one-hour testing in two guns, and a trigger pin was displaced in a third. This perfectly corroborates Hicks' and Villani's theories and observations that manufacturing defects inside the P320 fire control unit, i.e., excess metal material left on the surface faces of the spring-charged striker foot face and sear face, render that already

precarious connection[4] unstable and susceptible to failure when subject to inertial forces. As Hicks notes, the minimal contact area between the striker foot face and the sear face is below the Sig design intent because several parts of the P320 fire control unit do not meet the design specification.[5]   Ex. 2 , Hicks report, p. 4 - 13.

*Daubert* and its progeny[6] expressly recognize that testing in some cases may be impractical or impossible.  Hilton submits that this is one of those cases given the costs of realistic testing that could approach seven figures, assuming it could even be done realistically with robots.  Hilton also respectfully contends that additional laboratory testing is not necessary given the substantial number of OSI's - - and that Sig Sauer itself has acknowledged in writing that the product can fail in the fashion Hilton asserts.  The *Daubert* factors "do not constitute . . . a "definitive checklist or test." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. Rather, "[t]he inquiry envisioned by Rule 702 is ... a flexible one," *id.* at 594, 113 S.Ct. 2786, and "the gatekeeping inquiry must be tied to the facts of a particular case," *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167 (internal

---

[4]   Hicks' report observes that the striker foot, which is under constant spring pressure to fire the gun, has a surface contact area with the sear of 0.2 millimeters, less than the width of a United States dime which is 1.35 mm. Ex. 2, p. 8.

[5]   Hicks' report goes into painstaking detail of the procedure and methodology of the testing of the subject P320 components as compared to the Sig Sauer's component level drawings.  Id., pp. 7-14.

[6]   At least one commentator has expressed serious concerns about Daubert's impact on the Seventh Amendment:  "Daubert encumbers the right to a civil jury trial in at least three ways: (1) by replacing jury fact-finding with judicial fact-finding, (2) by authorizing judges to dismiss cases that do not survive Daubert hearings, and (3) by permitting litigants to spend an opponent into [a] disadvantageous settlement or to deter individuals from pursuing their legal rights in the first place.  Within this context, Daubert is properly understood as a legal development that alters the fundamental substance of the Seventh Amendment right to a civil jury trial. By giving judges the authority to resolve factual disputes and the corresponding discretion to prevent cases from ever reaching a jury, Daubert infringes on the core guarantee of the Seventh Amendment."  Boxler, Brandon L., *"Judicial Gatekeeping and the Seventh Amendment: How Daubert Infringes Upon the Constitutional Right to a Civil Jury Trial"* (2011). W&M Law Student Publications. 10. https://scholarship.law.wm.edu/studentpubs/10

quotation marks omitted).

B. **HILTON ADVANCED COMPELLING OSI EVIDENCE INVOLVING THE EXACT SAME GUN AND SAME PRODUCT DEFECT. UNDER TEXAS LAW, THE COURT SHOULD ALLOW HILTON TO PRESENT IT TO A JURY AS EVIDENCE OF DEFECT.**

At the time Hilton filed her opposition papers to Sig Sauer's motions, Sig Sauer had admitted to knowledge of no less than 55 other incidents of the P320 allegedly discharging without a trigger pull from 2016 to the present. Docket No. 38, p. 5. By the time Hilton filed her Motion for a Default Judgment for spoliation of Hilton's gun, that number nearly doubled to 99. Docket No. 60, p. 2, fn. 1. Hilton herself has evidence that the actual number exceeds 175. Ex. 4.

https://www.dropbox.com/scl/fi/vclh3ku9830gy2tlo8rcj/Sig-Sauer-Master-OSI-Tracker.xlsx?dl=0&rlkey=xpc5i6o30baedsarjwx8vneex

In its decision, the Court heavily relies on one case to exclude consideration of any of these incidents as they are, allegedly, probative of nothing: *Nissan Motors Co. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004), a case with extensive negative history. Order, p. 17. The Court cited *Nissan Motors,* a case involving unintended acceleration of cars with resulting injuries, for the proposition that "proof of many instances of unintended acceleration cannot prove a defect either; a lot of no evidence is still no evidence." Id. Acknowledging that *Nissan Motors* held that similar incidents may be admissible for certain purposes," it then cites the following block quote from the decision:

> [W]e have never held that mere claims of previous accidents can prove a product is defective, and we decline to do so here. A number of complaints may require a prudent manufacturer to investigate, and may presage liability if those complaints are substantiated and the manufacturer does nothing. But a large number of complaints cannot alone raise a fact question that a defect exists.

Order, p. 18.

8

8

This excerpt does not accurately reflect the holding of the case, nor that the court held that it was up to the jury to decide what caused plaintiff Armstrong's injury. The *Nissan Motors* court stated earlier in its decision that:

> Just as proof of other accidents may show a crossing is extra-hazardous, proof of other accidents **may be introduced to show a product is unreasonably dangerous**. But several restrictions apply. First, as in the train-crossing cases, **the other incidents must have occurred under reasonably similar (though not necessarily identical) conditions.** The degree of similarity required depends on the issue the evidence is offered to prove.

*Nissan Motors*, at 137-138 (emphasis added).[7]

Hilton is not offering "mere claims" of previous accidents; she offers substantive evidence including eyewitness testimony, Sig Sauer's own admission in a press release, and videotapes of substantially similar accidents all involving the same gun and same product defect, i.e., all fired without a trigger pull. Hilton's OSI's, 99 of which have been acknowledged by Sig Sauer as having been reported, all involve the same gun and same defect. The *Nissan Motors* court, in fact, did not hold that all OSI's introduced in the trial were erroneously admitted as evidence of defect; it held that more than 200 of the 757 OSIs asserted that similar incidents "involved cars that did not even have the defective throttle mechanism at issue." *Id*. at 141. The court was careful to distinguish the admission at trial of irrelevant reports from eight reports involving "allegedly similar defects," all of which were admitted:

---

[7] *Citing Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 340–41 (Tex.1998) *and* Ferdinand S. Tinio, Annotation, *Products Liability: admissibility of evidence of other accidents to prove hazardous nature of product*, 42 A.L.R.3d 780, 783 (1972) (noting "evidence of other accidents involving the same product is generally admissible to show its dangerous or hazardous nature, if the accidents occurred under the same or substantially similar conditions as that involving the plaintiff, and with reasonable proximity in time").

9

9

> Eight of the reports (including those in NHTA's files) point to a defective throttle cable or boot as the cause. Of the eight that might involve similar defects, only two appear to involve rapid acceleration (similar to Armstrong's claim) rather than a stuck throttle that simply would not decelerate; the latter would be relevant only if Armstrong pressed the accelerator more than she admitted. Nevertheless, we agree with Armstrong that on the record before us *the trial court did not abuse its discretion in admitting the eight reports of allegedly similar defects*.
> *Id*. at 142.

Hilton has evidence of more than 175 OSI's all involving the same gun and same product defect. Many have been authenticated in deposition testimony, and videotapes have been authenticated in deposition testimony. Yet the Court in its Order refers to all this evidence, using a phrase from *Nissan Motors*, as a "lot of no evidence." Order, p. 17.

### C. THE COURT INVERTED THE SUMMARY JUDGMENT STANDARD AND DREW FACTUAL INFERENCES IN FAVOR OF MOVANT SIG SAUER

In its Order, the Court correctly recites the well-known summary judgment standard: "All reasonable inferences must be drawn in favor of the nonmoving party" and all evidence must be viewed "in the light most favorable to the nonmoving party". Order, p. 12. In its brief recitation of the background of the case, however, the Court does precisely the opposite.

The Court seems to countenance that a bottle of "body spray" might have pulled the holstered P320's trigger when there is no record evidence at all supporting such an absurd inference; that the gun was, perhaps, improperly in her handbag "along with other loose items"[8] (when it is undisputed that it was properly holstered and when even

---

[8] That items in her handbag were "loose" is nothing more than a Sig talking point in the case. Docket No. 28. p. 2. It suggests, without any evidence, that one of these "loose" items somehow got into her holster, wound its way down between the sides of the holster and gun, then *turned left*, somehow then defeated the trigger guard and latched onto the bottom of the trigger, and then pulled it, after which the gun emerged to her fellow officer Bergeron with no such loose item attached to the trigger. It also unfairly suggests to the reader that her gun *itself* was a "loose item" when it was in fact fully holstered. This is another stark example of the Court incorrectly applying the Rule 56 standard in favor of Sig Sauer. Indeed, the Court's Background section copies Sig's "statement of undisputed facts" almost word for word. Order, p. 1.

Sig Sauer agreed that it was fine for the weapon to be transported that way); or that it perhaps should not have been "loaded," though that is standard operating procedure for all American law enforcement. Order, p. 1.

The Court ignored that the gun was missing a safety lever return spring and was securely holstered at all times, that Sig Sauer's own experts could not say what made Hilton's gun fire, and that Hilton was a sex crimes detective who properly carried her holstered gun in a handbag to avoid inflicting stress on the sex crime victims with whom she interacted.[9] The Court glossed over the fact that Sig Sauer had previously admitted in 2017 that vibration, among other inertial forces, could make the safety of the P320 fail, and nowhere recites Sig Sauer's own admission of 99 prior reported incidents of P320's firing without trigger pulls. By omitting the latter facts, the Court drew inferences in favor of the movant Sig Sauer squarely in violation of Rule 56.

It is settled that facts, and inferences reasonably drawn from them, are the sole province of the jury to resolve under the Seventh Amendment, not the Court. One could just as easily infer - - consistent with Rule 56 - - that the gun was defective given that it went off while holstered with Hilton's hands nowhere near the gun and with no object within Hilton's handbag capable of forcing itself inside the trigger guard and pulling the holstered trigger. Regardless, these are all plainly issues of fact for a jury to resolve. *See, e.g., Anthony v. Sunbeam Prod., Inc.,* No. 1:18-CV-607, 2020 WL 4677429, at *6 (E.D. Tex. May 5, 2020), *citing Reeves v. Sanderson Plumbing Product, Inc.,* 530 U.S. 133, 150 (2000) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

---

[9] Rather than re-recite the evidence and citations to it, Hilton incorporates by reference her opposition to Sig's motion for summary judgment and to exclude her expert witnesses and all exhibits thereto. Docket Nos. 35, 37-38.

(quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986))).

The *Sunbeam* product defect case is instructive on the issue of the Rule 56 standard - - in addition to the negligence claim in this case. The court there noted that "[w]hile it is possible that [plaintiff], in a sleeping-pill-induced fog, repeatedly turned the heating pad on, suggesting his injuries were caused by his own negligence" - - an extreme inference like a bottle of body spray pulling the trigger of a holstered gun - - "determining which of these alternatives is more likely requires weighing . . . credibility, **which is the function of the jury, not the court**." *Id.* The court then refrained from deciding which inference was reasonable leaving it to a jury: "[h]ere, however, the jury could rely on [plaintiff's] testimony that the heating pad was producing heat despite the fact that, according to the power indicator light, the heating pad was turned off and thereby infer that the heating pad was defective. Simply put, heating pads—especially new or nearly new heating pads that have not been damaged or abused -- *do not ordinarily cause users third degree burns absent a product defec***t**." 2020 WL 4677429 at * 6 (emphasis added).

It is the same case with Hilton's P320, which was a new, "upgraded" model of the gun. Sig Sauer presented no evidence of abuse of the weapon (other than a "scratch mark" that Hilton has convincingly shown to have been imposed after Sig Sauer took possession of the gun), nor could Sig Sauer's experts explain how or why the gun fired inside its holster inside a handbag:

> Q. Well, what do you think pulled Ms. Hilton's trigger?
>
> A. We don't have enough information to lock it down to any one thing because there were no witnesses other than Ms. Hilton, who didn't see the gun actually discharge, according to her testimony. So the thing is we don't have enough information.

Docket No. 38, p, 9, fn. 7.

12

12

The absurdity of this answer is obvious: no one could have witnessed a P320 inside a handbag discharge given that it was holstered and inside a handbag. If witnessing the gun discharge unexpectedly is the legal standard to get to a jury, no case would ever make it. None of the 99 other victims of the P320 were staring at their guns at the moment of discharge. Moreover, in *Sunbeam*, unlike the case at bar, the plaintiff had *no* experts to support his claim of defect. Yet the court nevertheless allowed a jury to hear it under the doctrine of *res ipsa loquitur*:

> The ultimate question is whether the plaintiff has presented sufficient evidence from which the jury could form "a reasonable basis for concluding the injury would not ordinarily have occurred absent a defect." Thus, rather than adopting § 3 as written, it appears that Texas courts have applied the doctrine of *res ipsa loquitur* in some instances to support the inference that a product was defective.
>
> As Justice Hecht explains in *Ridgway*: The rule of *res ipsa loquitur* allows an inference of negligence, absent direct proof, only when injury would ordinarily not have occurred but for negligence, and defendant's negligence is probable. There is no reason to allow an inference of products liability any more freely than an inference of negligence. An inference of products liability is really two inferences: (1) that the product was defective, and (2) that the defect existed at the time of sale. Applying the principle underlying *res ipsa loquitur*, neither inference can be drawn without evidence that the injury would not ordinarily have occurred absent a product defect and that defect probably existed when the product was sold.

2020 WL 4677429 at * 5 (internal citations omitted).

Applying the summary judgment standard reasonably, there is no reason a rational jury could not also conclude that Hilton's P320 discharged due to a defect, with or without expert testimony. A gun is a relatively simple machine; it is not a rocket ship or a computer.[10] A rational jury could easily understand that holstered guns do not ordinarily discharge absent a defect, and Hilton has advanced overwhelming

---

[10] "At the same time, the subject matter of Villani's opinion is not rocket science. In other words, Villani's lack of engineering experience is less important than it might be in another case with a more complex machine." *Guay v. Sig Sauer, Inc.*, 610 F. Supp. 3d 423, 430 (D.N.H. 2022)

evidence that the P320 is susceptible of discharging without a trigger pull. All three of her experts, moreover, concluded that her P320 did fire without a trigger pull, not just that it could have.

In its Order, the Court did not draw this reasonable inference in Hilton's favor. This was error.

Finally, the Court's reframing of Sig Sauer's August 2017 press release, admitting that certain inertial forces could make the gun fire without a trigger pull, as a "generic disclaimer" is another troubling example of inferences inexplicably drawn in favor of Sig Sauer. A press release is not a disclaimer; it is an admission, in this case at least, of a defect. *See, e.g., McCowan v. City of Philadelphia*, 603 F. Supp. 3d 171, 182 (E.D. Pa. 2022) ("[t]he press release is not hearsay, but admissible evidence as an admission of a party-opponent under Fed. R. Evid. 801(d)(2)(A)"); *Kleppel v. Hunter's Manufacturing Company, Inc.*, 2018 WL 6436269 (S.D. Texas 2018) (press release evidence in product defect case).

IV. **IN RESPONSE TO A QUESTION ABOUT WHO SHOULD APPEAR AT THE HEARING, EITHER IN PERSON OR VIA ZOOM, THE COURT'S CLERK ON DECEMBER 12, 2022, STATED "ATTORNEYS" MUST APPEAR IN PERSON AND THAT ZOOM WOULD NOT BE PERMITTED EVEN DURING THE ONGOING COVID STATE OF EMERGENCY. FOR THE COURT TO CLAIM THAT HILTON "FORFEITED" HER RIGHT TO HAVE HER EXPERTS APPEAR AND "REMEDIATE DEFICIENCIES" IS THEREFORE UNFAIR AND UNREASONABLE.**

Unlike the Court here, the district courts in South Carolina, Kentucky and New York did not hold a hearing on Sig Sauer's *Daubert* or summary judgment motions. Each dismissed the cases without hearing the parties or their experts. In pointing out in dispositive briefing that the New Hampshire judge who permitted Hicks and Villani to testify had heard testimony from the experts, counsel for Hilton merely argued that her decision was better grounded. In no way was this meant as an affront to any of the other courts, but to emphasize that the New Hampshire court had the benefit of hearing each

and rendered a different decision from the South Carolina judge in *Frankenberry v. Sig Sauer*,[11] which the Kentucky and New York courts chose to follow. In the latter decision, moreover, Hilton's expert Hicks had not been disclosed or even retained, and the gun was un-holstered unlike the case here.

In this case, counsel received notice of the Daubert hearing on December 6, 2022. Due to counsel being in state of recovery from a serious medical procedure, Sig Sauer's inquiry whether they would testify, and the ongoing state of the COVID emergency, Hilton ultimately inquired of the Court's clerk on December 7, 2022, whether the hearing could be held via Zoom, both to accommodate counsel's recovery and avoid the approximate $15,000 cost in person expert appearances would involve.[12]

The response conveyed from the clerk's office was that "all attorneys must be present in person. The Court does not do Zoom hearings." Ex 5. Counsel complied with their response and appeared in person on December 20, 2022. Hilton's experts were not ordered to appear, and the prospect of their testimony by Zoom was ruled out by the clerk's message. It is Hilton's recollection that the Court did not ask to hear from her

---

[11] The New Hampshire district court was **not** alone in allowing a P320 case to go to a jury without testing or replication of a defective discharge. In *Vadnais v. Sig Sauer, Inc.*, 1:18cv00540 (EDVA 2019), the court also **denied** Sig's *Daubert* and summary judgment motions from the bench, including a challenge to Hilton's expert Jonathyn Priest, finding him well qualified to testify. Neither expert in that case had replicated a defective discharge. The case, which involved a catastrophic injury to a deputy sheriff's femur, settled on day 2.

[12] In *Guay v. Sig Sauer, Inc.*, 20-cv-736-LM, the court's Daubert hearing Order stated: "ENDORSED ORDER. Text of Order: Sig Sauer filed motions to exclude plaintiff's experts Peter Villani and Timothy Hicks. Doc. nos. 26, 27. Sig Sauer also filed a motion for summary judgment premised on the court excluding Villani and Hicks. Doc. no. 28. Having reviewed the parties' submissions, the court finds that a Daubert hearing is warranted before resolving those motions. Accordingly, the parties shall confer and identify dates falling on or after June 27, 2022, for a Daubert hearing to be conducted by Zoom videoconference. The court will leave in the parties' discretion whether to introduce live testimony or simply rely on materials in the record; the court finds that oral argument will assist in its decision. See Quilez-Velar v. Oz Bodies, Inc., 823 F.3d 712, 716 n.4 (1st Cir. 2016). The parties shall report their proposed dates to the case manager on or before June 23, 2022. So Ordered by Chief Judge Landya B. McCafferty. (Entered: 06/21/2022)."

experts during or after the hearing, and approximately the last ten minutes were spent scheduling a trial for January or July 2023.

In its Order dismissing Hilton's entire case, the Court faulted Hilton's counsel for not having her experts in appear in person, despite the ongoing COVID emergency and the communication that Zoom testimony would not be permitted. The Order stated that Hilton "forfeited the opportunity to have her experts potentially remediate these deficiencies." Order, p. 11.

Hilton should not be penalized given the history of the communications on this issue. Both experts had just testified via Zoom in New Hampshire, and they would have been made available had it been permitted or ordered. The communication was that only attorneys were to appear in person. It was counsel's clear understanding that the experts did not need to appear in person and would not be allowed to testify via Zoom.

V. **CONCLUSION**

For the reasons stated, Hilton requests that her Motion be granted, that the Court (i) vacate its Order granting summary judgment in favor of Sig Sauer, (ii) schedule a hearing to hear Hilton's expert witnesses and/or (iii) appoint an expert pursuant to its own plenary powers under Federal Rule Evid. 706, if it remains unsatisfied with her three experts, rather than summarily divest Hilton of her Constitutional right to a jury trial.

Sig Sauer is free to cross-examine and present its own case.

Respectfully submitted,

Plaintiff Brittany I.

Hilton


*/s/Jeffrey S. Bagnell*
_____

16
16

Jeffrey S. Bagnell
Federal Bar No. CT18983
Admitted Pro Hac Vice
Jeffrey S. Bagnell, Esq., LLC
55 Post Road West
Westport, CT 06880
(203) 984-8820
jeff@bagnell-law.com

**SICO HOELSCHER HARRIS LLP**

*/s/ James H. Hada*

James H. Hada
Federal Bar No. 11527
3 Riverway, Suite 1910
Houston, Texas 77056
Office: 713.465.9944
Facsimile: 877.521.5576
E-Mail: jhada@shhlaw.com

**ATTORNEYS FOR PLAINTIFF**

CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following parties on this 20th day of June 2023, via CM/ECF, hand delivery, overnight courier, U.S. Mail, certified mail, return receipt request, or facsimile, pursuant to the Federal Rules of Civil Procedure upon all parties.

/s/ Jeffrey S. Bagnell